Phillip C. CARTER, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–5493.

Court of Appeals of Alaska.

Feb. 9, 1996.

Lance C. Wells, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

OPINION

BRYNER, Chief Judge.

Phillip C. Carter, Jr., pled no contest to one count of misconduct involving a controlled substance in the fourth degree, for growing marijuana. *See* AS

11.71.040(a)(3)(F). In entering the plea, Carter reserved the right to appeal Superior Court Judge Beverly W. Cutler's denial of a motion to suppress evidence. On appeal, Carter asserts that the evidence against him was obtained by a search of his residence that was conducted pursuant to a warrant issued without probable cause. We reverse.

On October 6, 1993, Investigator Jeannine Santora of the Alaska State Troopers applied for a warrant to search Carter's residence for evidence of a marijuana growing operation. Palmer Magistrate David L. Zwink conducted a hearing on the application. In support of the warrant, Santora submitted two affidavits: the first dealt with anonymous tips alleging Carter's involvement in drug-related activity in the vicinity of Houston, Alaska; the second dealt with Matanuska Electric Association (MEA) records purportedly showing a suspicious pattern of electrical consumption by Carter.[1]

In her first affidavit, Santora described four anonymous tips, called in to the police over a period of approximately three and one-half years. Each tip alleged Carter's involvement in drug-related activities. Santora's affidavit provided nothing to indicate whether the tips came from the same person or involved multiple tipsters.

1. Santora executed the first affidavit on October 4, 1993, and submitted it that same day to secure a warrant authorizing seizure of MEA records dealing with Carter's electrical consumption. Magistrate Zwink issued the warrant. After obtaining the MEA records, Santora executed her second affidavit on October 6, and submitted it, together with her previous affidavit, to obtain the warrant authorizing a search of Carter's residence. Carter has not challenged the initial warrant authorizing seizure of MEA records; he argues only that the second warrant lacked probable cause.

2. Santora's affidavit described the most recent tip first and then set the rest out in chronological order. In relevant part, the affidavit recited:

On August 30, 1993, the Anchorage office of the Statewide Drug Enforcement Unit [DEU] received a tip that Philip Carter was supposed to be purchasing a house in the Big Lake area, and he has a grow at that residence which is on Cher[i] Lake Road, second house on the left in Houston. The tip also provided that Carter was "dealing" to people in the Big Lake area[.]

According to Santora, the first tip, received by Anchorage Crimestoppers on March 19, 1990, reported that Carter and his sixteen-year-old daughter Julie were living in a residence in Houston, where they were "selling 'just about everything,'" and had "other people 'growing for them.'" The second tip, received by the Anchorage Drug Enforcement Unit (DEU) on January 27, 1992, asserted that Carter "has an indoor grow and is dealing cocaine" at his residence. Both of these tips included general descriptions of Carter and of the location of his home.

The third tip, a Crimestoppers call to the Mat–Su Narcotics office on May 19, 1993, reported an "individual who is selling marijuana and gets his marijuana from another individual and Phil Carter." According to the tip, Carter and the other unnamed individual were "growing a lot of marijuana and selling in the Valley." This tip did not describe Carter or mention his residence, but it listed a telephone number for him. The final tip, a call to the Anchorage DEU on August 30, 1993, alleged that Carter was purchasing a house on Cheri Lake Road in Houston, that he "has a grow" there, and that he "was 'dealing' to people in the Big Lake area."[2]

In addition to describing these tips, Santora's first affidavit confirmed that Carter

. . . .

On March 19, 1990, it was reported to Anchorage Crimestoppers that Phil Carter, a white male age 30 to 40 with brown hair, and Julie Carter, white female age 16, lived in Houston, Alaska at the end of Horizon Boulevard. The caller provided that they are father and daughter selling "just about everything." The caller also provided that they have other people "growing for them."

On January 27, 1992, the Anchorage office of the [DEU] received information that Phil Carter has an indoor grow and is dealing cocaine at four miles past Big Lake cut off, before Houston. Phil Carter is described to be a white male, late to mid 40's, six feet tall with brown hair.

On May 19, 1993, the Mat–Su Narcotics office received a Crimestoppers tip from an anonymous caller reporting on an individual who is selling marijuana and gets his marijuana from another individual and Phil Carter. The caller lists Carter's phone number as 8–9–2–7–8–0–2. The caller goes on to state that the other individual and Carter are growing a lot of marijuana and selling in the Valley.

owned a residence near Cheri Lake Road in Houston. Santora had driven by the house on September 9, 1993. She described it as a single family residence with an attached garage; the garage had an overhead door with "two windows which were covered from inside." According to the affidavit, Department of Public Safety records indicated that a nineteen-year-old female named Julie Carter lived at the same location; the records also indicated that Carter's telephone number was 892–7920.[3] Santora's affidavit further stated:

> Investigator Ed Harrington, with the Alaska State Troopers assigned to the DEA task force, informed Investigator Santora that PHILLIP CARTER was willing to provide information to Investigator Harrington during the summer of 1992, about cocaine activity, but not marijuana. CARTER told Investigator Harrington that CARTER believes marijuana should be legalized.

Santora's second affidavit summarized MEA records of electrical consumption at Carter's Cheri Lake Road residence. The records themselves were introduced at the October 6, 1993, search warrant hearing. Those records indicated that Julie Carter first occupied the residence in August of 1992, when the utility account was placed in her name. Due to nonpayment of bills by the Carters, the utility account was relisted to the name of the Carters' landlord on February 1, 1993. A service order dated March 1 restored the account to Julie Carter's name; a handwritten remark on the service order indicated that "Julie paid her bill of $2,192.86 on March 23, 1993[.]"

In order to supplement and interpret the MEA records described in Santora's second affidavit, the state called MEA employee Byvan Bogue to testify at the October 6 search warrant hearing. Bogue testified that he found nothing remarkable in the Carters'

electrical consumption from shortly after the beginning of Julie Carter's listing on the account in August 1992 through February 1993.[4] But beginning in March 1993, Bogue thought he detected "the first clues that something else is ... happening." What Bogue detected was that, in the March, April, and May billings,[5] the Carters' electrical consumption remained relatively constant—approximating their winter consumption—even though average outdoor temperatures rose significantly. Although June, July, and August consumption decreased significantly, September and October consumption increased sharply—to winter levels—even though the fall temperatures remained relatively mild. Bogue interpreted this type of electrical usage pattern to show that "something else other than normal household usage is taking place." In Bogue's view, the pattern was "very consistent with growing marijuana."

Based on this evidence, Magistrate Zwink issued the requested warrant, finding probable cause to believe that Carter was growing marijuana in his home. In issuing the warrant, the magistrate reasoned that, given the recent pattern of electrical consumption and the variance between Carter's use and the owner's past use during the same months, there was "something highly suspicious about [the] electrical usage, which is consistent with a marijuana growing operation of some size[.]" In the magistrate's view, this suspicious usage, coupled with "the observation of the trooper that there are some blacked out windows there," amounted to "corroborating factors to the tips, which clearly indicated that ... Phillip and Julie [Carter] were selling marijuana [at the Carters']."

The troopers executed the search warrant the next day. At Carter's house, they found and seized 248 marijuana plants (199 starter plants and 49 more mature plants), growing equipment, lights, scales, and miscellaneous

---

3. This number differs from the number provided in the third tip.

4. As to August 1992, the month Julie Carter's name was first listed on the account, Bogue commented the consumption was "extremely high ... well outside the bounds."

5. Bogue testified that the monthly billings actually reflected consumption occurring during the preceding month. The Carters' monthly billings included a statement of the average daily temperature for each month billed; these averages evidently also reflected the month of actual consumption, rather than the month of billing.

drug paraphernalia. Charges were subsequently filed against Carter, who moved to suppress this evidence, arguing that the October 6 warrant was not supported by probable cause.

Judge Cutler denied Carter's suppression motion. The judge stated that if there had been just one tip and the electrical information, the state would have "a very, very slim case." However, Judge Cutler concluded that probable cause had been established by the multiplicity of tips and the corroborating MEA records. Judge Cutler also relied on three other facts mentioned in Santora's first affidavit: the covered windows on Carter's garage door; Julie Carter's lump sum payment in March 1993 of $2192.86 for past due charges—from which the court found an "obvious inference" that the Carters had just sold a marijuana crop; and Carter's 1992 statement that he believed that marijuana should be legalized.

On appeal, Carter challenges Judge Cutler's findings and argues that the information before Magistrate Zwink was insufficient to establish probable cause.

■ "Probable cause to issue a search warrant exists when 'reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed.'" *Van Buren v. State*, 823 P.2d 1258, 1261 (Alaska App.1992) (quoting *Badoino v. State*, 785 P.2d 39, 41 (Alaska App.1990)). In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the United States Supreme Court articulated a two-prong analysis for determining the validity of an affidavit that relies on a confidential informant's tip to establish probable cause. Although, for federal constitutional purposes, the Supreme Court subsequently abandoned *Aguilar–Spinelli*'s biprongularity in favor of a totality of the evidence test, *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the *Aguilar–Spinelli* doctrine continues to govern the determination of probable cause under Article I, Sections 14 and 22 of the Alaska Constitution. *State v. Jones*, 706 P.2d 317, 324–25 (Alaska 1985).

The Alaska Supreme Court has described Alaska's application of the *Aguilar–Spinelli* test as follows:

When a search warrant is based on the hearsay statement of a confidential informant, the affiant must establish the informant's basis of knowledge and veracity. To establish the informant's basis of knowledge, the information must be based on the informant's personal observations, not his suspicions or beliefs. If the affidavit lacks an affirmative allegation of the informant's personal knowledge, "the facts supplied must be so detailed as to support an inference of personal knowledge."

Additionally, the affiant must inform the magistrate or judge of some of the underlying circumstances that led the affiant to conclude that the informant was credible or that his information was reliable. An informant's veracity may be established by demonstrating his past reliability, or by independent police corroboration of detailed facts in the informant's story. The personal identity and involvement of the informant may also establish his veracity.... Finally, an informant's admission against his penal interest may be sufficient to establish his veracity in certain circumstances.

*Jones*, 706 P.2d at 324–25 (citations and footnotes omitted). In describing the *Aguilar–Spinelli* test's application to Alaska cases, our supreme court has also emphasized that "[i]t is imperative under the Alaska Constitution that the magistrate be presented with adequate supporting facts so that he can independently test the confidential informant's basis of knowledge and veracity." *Id.* at 326.

■ Applying *Aguilar–Spinelli* to the four anonymous tips received by the police in the present case readily reveals their deficiency. The tips provided general descriptions of Carter, his daughter, Carter's telephone number, and the location of Carter's residence. But their allegations of drug-related activities were devoid of factual substance, advancing little more than conclusory accusations. Neither alone nor in combination do the tips contain any "supporting facts" that

might have enabled the magistrate to "independently test the confidential informant's basis of knowledge and veracity." *Jones,* 706 P.2d at 326. Nothing in any of the tips would support an inference that the confidential informant or informants who reported them to the police spoke truthfully or from personal knowledge.

 To be sure, Investigator Santora confirmed some of the factual information in some of the tips. But the limited facts about Carter and his residence that Santora confirmed involved general information that would be readily available to virtually anyone in the community.[6] At best, corroboration of such general facts "only justifies an inference that the informer has some knowledge of the suspect and his activities, not that criminal activity is occurring." *State v. White,* 720 P.2d 873, 875 (Wash.App.1986) (quoting *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136, 140 (1984)). Although information corroborating a confidential informant's tip need not be independently incriminatory, *Schmid v. State,* 615 P.2d 565, 577 (Alaska 1980), it must relate to the tip in some way that lends credibility to the report of illegality. *Clark v. State,* 704 P.2d 799, 804 (Alaska App.1985). Thus, corroboration of public facts or wholly innocuous details will not suffice. *See, e.g., State v. Young,* 123 Wash.2d 173, 867 P.2d 593, 604 (1994) (en banc).

Apart from confirming some of the general information from some of the anonymous tips, Santora described several observations that Magistrate Zwink and Judge Cutler found to be indicative of drug-related activity, and not innocuous. The first such observation was what Magistrate Zwink referred to as the "blacked out" garage door windows. Santora, however, never stated that the windows of the garage doors were "blacked out." She averred, instead, that they were covered from the inside, and she did not specify whether the covering was opaque, translucent or transparent. Nor did Santora state whether there were other windows on the garage; describe whether she saw any other covered windows on the garage or house; or

provide any detail to suggest that the coverings she did see were meant to obscure vision or promote plant growth.

The mere presence of two "covered" windows on a garage door supports no inference of criminality. *Cf. State v. Huft,* 106 Wash.2d 206, 720 P.2d 838, 839, 841 (1986) (en banc) ("'extremely high-intensity light' emitting from basement window" insufficient to corroborate anonymous, conclusory tips of marijuana-growing operation in defendant's basement apartment).

Second, Judge Cutler found it significant that, in March 1993, Julie Carter made a $2,000 lump-sum payment for back electrical bills. The judge found it an "obvious inference" from the payment that the Carters had just sold a marijuana crop. Yet there is nothing in the record to support such an inference. Indeed, according to Bogue's testimony at the search warrant hearing, the electrical records for the months preceding the payment indicate normal winter electrical consumption. And while lump-sum payments of cash made under unusual circumstances have been deemed indicative of criminality, *see, e.g., State v. Christen,* 79 Or.App. 774, 720 P.2d 1303, 1310 (1986) (en banc) ("payment in six crisp new one-hundred-dollar bills when defendant indicated he worked only occasionally"), there is nothing here to indicate a cash payment, and no suspicious circumstances are described.

We are aware of no authority standing for the proposition that the mere payment of a past due bill in and of itself supports an inference of criminality. The inherent fallacy of such an inference is that it depends on circular reasoning. To infer the obvious existence of criminal activity from nothing more than the fact that a past due bill has been paid in lump sum requires one to assume the existence of precisely the criminality one seeks to confirm: thus, the inference that Julie Carter paid her utility bill using funds derived from a marijuana crop becomes "obvious" only if we assume at the outset that the Carters were raising marijua-

---

**6.** Santora's affidavit also established that Carter's actual telephone number differed from the number provided in the third tip.

na. Without such an assumption, the fact of payment itself suggests nothing.

Third, Judge Cutler mentioned as a corroborative fact Carter's year-old statement to a police officer expressing the belief that marijuana should be legalized. But to conclude that a person who expresses a legitimate social or political belief is likely to disregard the law to further that belief requires reliance on an inferential process that at best is highly attenuated and at worst recalls the abuses of the McCarthy era. Absent a clear factual context suggesting Carter was prepared to act illegally when he expressed his belief that marijuana should be legalized—and no such factual context was set before the magistrate here—no incriminatory significance can be ascribed to Carter's statement.

In short, because Santora's observations confirmed only general background facts and revealed no "extrinsic objective facts indicative of criminal activity[,]" *White*, 720 P.2d at 875, they added nothing of substantive value from which the truthfulness or basis of the informants' reports of criminality could be gauged. The allegations of drug-related activities that were advanced in the four anonymous tips thus remained wholly conclusory and speculative, even considering the additional observations Santora described in her affidavit.

Nor can it be deemed significant that more than one tip was received—a consideration Judge Cutler found important in upholding the warrant. On past occasions we have recognized that "[c]ross-corroboration among informants is a well-accepted method of demonstrating the validity of the information given." *Lewis v. State*, 862 P.2d 181, 186 n. 5 (Alaska App.1993) (quoting *State v. Prince*, 93 Or.App. 106, 760 P.2d 1356, 1359–60 (1988) (en banc) (citations omitted)). But this method of corroboration is based on the common sense assumption that like factual details emanating from independent sources are apt to be credible.

Here, as the state conceded below, there is nothing in the record to establish that the four tips in question originated from different informants. Moreover, as we have already indicated, none of the anonymous tips in this case contained any factual detail capable of cross-corroborating other tips or being cross-corroborated in return: all involved conclusory and unsupported allegations of criminal activity.[7]

■ The mere repetition of a conclusory accusation cannot enhance its reliability or credibility. "Quality of information, not quantity, is what establishes probable cause." *Huft*, 720 P.2d at 841. A house of probable cause can not be built by piling bricks of speculation one atop another; without a mortar of factual detail to bind them, the bricks will fall. Here, we have four bricks and no mortar.

■ It remains to be considered whether the four anonymous tips in the present case added enough to the evidence of Carter's unusual electrical consumption to establish probable cause. It is well settled that an anonymous tip that does not meet the *Aguilar–Spinelli* test may be considered insofar as it corroborates other evidence. *See Spinelli*, 393 U.S. at 418, 89 S.Ct. at 590; *State v. Chapman*, 783 P.2d 771, 773 & n. 2 (Alaska App.1989). Such a tip may be used to "suppl[y] the 'little bit more' which is needed to elevate [highly suspicious] information up to the level of probable cause[.]" 2 Wayne R. LaFave, *Search and Seizure* § 3.3(f) at 180 (3d ed. 1996).

■ In considering this issue, we must note at the outset that utility records showing unusual electrical consumption have no inherent incriminatory value. There are many common and legitimate uses of electricity that might account for high or unusual electrical consumption, such as use of an electric sauna, a hot tub, a potter's kiln, or even a "grow operation" involving exotic flowers. Although a proper showing of probable cause need not rule out all possibilities

---

7. In this regard it is worth noting that, even as to innocuous details, Santora's independent investigation corroborated primarily the last tip. Although Santora confirmed Carter's residence as reported in the most recent tip, she did not confirm his occupancy of the residence described in the first two tips—evidently different than the one Carter occupied when the warrant was issued.

consistent with innocence, neither can it consist of an undifferentiated showing that, among multiple competing possibilities, one is consistent with guilt. Probable cause must at least point the finger of likelihood toward a possibility consistent with guilt.

For this reason, courts in other jurisdictions have tended to find evidence of unusual electrical consumption to be significant to the overall determination of probable cause only if other solid facts have been presented to the issuing magistrate to indicate that criminal activity is afoot or to eliminate legitimate explanations for the unusual consumption.[8] Absent solid facts indicating criminality or non-legitimate consumption, courts have concluded that electrical records showing unusual consumption—even when combined with conclusory, anonymous tips of drug-related activity—are insufficient to establish probable cause.[9]

Standing alone, the evidence in the present case that Carter's electrical consumption was "very consistent with growing marijuana" does little more than say that growing marijuana is one possible explanation for the unusual consumption disclosed by the MEA records. Nothing in the MEA records or in Byvan Bogue's testimony interpreting those records rules out any of the multitude of other conceivable explanations for the same pattern of use or demonstrates that growing marijuana was a more likely explanation than others.

Nor can the four anonymous tips in this case be deemed to shift the balance toward probable cause. As we have already observed, these tips, whether viewed collectively or individually, advanced no "extrinsic objective facts indicative of criminal activity," *White*, 720 P.2d at 875. If an anonymous and conclusory allegation of drug-related activity were sufficient to elevate evidence of unusual electrical consumption from the level of mere suspicion to that of probable cause, then the probable cause requirement might well be reduced to little more than a hollow exercise in self-fulfilling prophecy. For example, a meter reader who happened to notice high or unusual electrical consumption at a residence would be free to create probable cause by making an anonymous report that the homeowner was operating a "marijuana grow."[10] Police following up on the tip would discover the high use or unusual consumption and have probable cause. Worse yet, virtually any would-be mischief-maker who knew of a homeowner pursuing a perfectly legitimate activity that consumed unusual amounts of electricity would have an open invitation to instigate a police search by calling in the same type of tip.

We are fully cognizant that a magistrate's decision to issue a search warrant may be reversed only when clearly erroneous. *Lewis*, 862 P.2d at 185 (citing *State v. Bianchi*, 761 P.2d 127, 129–30 (Alaska App. 1988)). We are also aware that the magistrate's findings are entitled to great deference, and must be upheld in doubtful or marginal cases. *Lewis*, 862 P.2d at 185 (citing *Metler v. State*, 581 P.2d 669, 673 (Alaska 1978) and *Kvasnikoff v. State*, 804 P.2d 1302, 1306 (Alaska App.1991)). In the present case, however, the record is not marginal and establishes clear error in the probable cause finding.

We hold that the superior court erred in denying Carter's motion to suppress. Carter's conviction must therefore be REVERSED.

---

**8.** *See, e.g., State v. Darroch*, 117 Or.App. 185, 843 P.2d 978, 979–80 (App.1992); *Christen*, 720 P.2d at 1309.

**9.** *See, e.g., State v. Young*, 123 Wash.2d 173, 867 P.2d 593, 604–05 (1994) (en banc); *White*, 720 P.2d at 875–76; *Huft*, 720 P.2d at 841.

**10.** Indeed, the circumstances of the present case provide no assurance that this did not occur here.