Brian E. LLOYD, Appellant,

v.

STATE of Alaska, Appellee.

No. 1467.

Court of Appeals of Alaska.

April 19, 1996.

Rehearing Denied May 10, 1996.

Suzanne Weller, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

BRYNER, Chief Judge.

Brian E. Lloyd entered a plea of no contest to a charge of misconduct involving a controlled substance in the fourth degree, AS 11.71.040(a)(3)(F) (possession of more than a pound of marijuana), and was subsequently convicted based on this plea. Lloyd appeals, contending that Superior Court Judge Karen L. Hunt erred in denying his motion to suppress evidence obtained pursuant to a warrant issued without probable cause.[1] We reverse.

On March 18, 1993, Anchorage Police Detective David A. Koch applied to District Court Judge Gregory J. Motyka for a warrant to search an Anchorage residence in which Lloyd was allegedly growing marijuana. A supporting affidavit submitted by Koch recited at length Koch's extensive ex-

---

1. In entering his plea, Lloyd reserved his right to appeal this issue, which is dispositive. *See Ove-* *son v. Anchorage,* 574 P.2d 801, 803 n. 4 (Alaska 1978).

perience and training in drug investigations; the affidavit went on to disclose that Koch's search warrant application was based on information received from an unnamed informant:

> On March 13, 1993 the Crime Stoppers line at the Anchorage Police Department received a phone call reporting a marijuana grow operation at 4618 McPhee. The caller said that Brian E. Lloyd was running a marijuana grow at that residence. The caller described the house as a small red house, also saying that they had seen 50–80 marijuana plants in the house two days before. The caller described Lloyd as being approx 30 yrs old, 5'6", 150 lbs.

The affidavit added that Koch had driven past 4618 McPhee on March 16 and had seen a small red house at the address, that a car registered to Lloyd had been parked in front of the house, and that "[a] computer check on Brian E. Lloyd shows him to be 5'8", 165 lbs, and 30 years of age."

Koch's affidavit also summarized information concerning recent electrical consumption at the residence—information Koch obtained by reviewing the residence's utility records, which, pursuant to a landlord application for service, listed a person named Don Wilson as the party responsible for payment:

> Upon reviewing the electrical consumption for 4618 McPhee I found the billing in January 1993 to be for 261 KW hours, February 1993 to be 878 KW hours, and March to be 1184 KW hours. This increase between the month of January and February was a 336% increase, the increase between January and March is a 453% increase despite the fact that March was significantly warmer than January.

> The electrical usage records further indicate the consumption for the month of December 1992 to be 215 KW hours, November to be 191 KW hours, October to be 273 KW hours.

In addition, the affidavit provided the following information concerning "foot traffic" Koch observed two months previously between the house at 4618 McPhee Street and another house:

> In January 1993 I was involved in a drug investigation which centered around 841 N Bliss. The General Investigations Unit of the Anchorage Police Dept along with the US Army CID unit were purchasing large quantities of marijuana at that residence. While performing surveillance on this residence I observed foot traffic between 841 N Bliss and 4618 McPhee.

Finally, the affidavit expressed Koch's belief, based on the foregoing information, that "there is now a marijuana grow operation" located at the McPhee Street residence and that Koch expected to find at the residence numerous listed items—including a variety of electrical appliances—that in Koch's experience were normally kept in connection with marijuana grow operations.

Based on this information, Judge Motyka issued the requested warrant. Officers executing the warrant found approximately forty mature marijuana plants, together with assorted marijuana growing equipment and paraphernalia. Lloyd admitted living at 4618 McPhee Street and being responsible for the marijuana, which he claimed to be growing for his personal use. Lloyd was subsequently charged with misconduct involving a controlled substance in the fourth degree.

Prior to trial, Lloyd moved to suppress the evidence derived from the March 18 search warrant, claiming, among other things, that the warrant lacked probable cause because it relied on an informant's tip that was insufficiently corroborated.[2] Judge Hunt denied Lloyd's motion, finding that, "[a]lthough this

---

**2.** In connection with the March 18 warrant Lloyd also claimed that Detective Koch had omitted material evidence by failing to submit electrical consumption records showing that, during the seven months preceding October 1992, the McPhee Street house had been billed for using amounts of electricity substantially similar to the amounts reflected in the February and March 1993 billings—amounts substantially greater than those reflected in the billings for the period between October 1992 and January 1993, which Koch had submitted. After an evidentiary hearing, the superior court determined that the alleged omissions had occurred and were material, but that they were made in good faith, and neither recklessly nor intentionally. Accordingly, the court declined to order suppression on this ground. *See State v. Malkin*, 722 P.2d 943 (Alaska 1986). Lloyd does not challenge this ruling.

is a very close question," sufficient corroboration had been presented. On appeal, Lloyd renews his challenge to the sufficiency of the warrant.

■ "Probable cause to issue a search warrant exists when 'reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed.'" *Van Buren v. State*, 823 P.2d 1258, 1261 (Alaska App.1992) (quoting *Badoino v. State*, 785 P.2d 39, 41 (Alaska App.1990) (quoting *Harrelson v. State*, 516 P.2d 390, 396 (Alaska 1973))). We have recently summarized the law that applies when a search warrant based on an informant's tip is challenged for lack of probable cause:

> In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the United States Supreme Court articulated a two-prong analysis for determining the validity of an affidavit that relies on a confidential informant's tip to establish probable cause.... [T]he *Aguilar–Spinelli* doctrine continues to govern the determination of probable cause under Article I, Sections 14 and 22 of the Alaska Constitution. *State v. Jones*, 706 P.2d 317, 324–25 (Alaska 1985).

> The Alaska Supreme Court has described Alaska's application of the *Aguilar–Spinelli* test as follows:

> > When a search warrant is based on the hearsay statement of a confidential informant, the affiant must establish the informant's basis of knowledge and veracity. To establish the informant's basis of knowledge, the information must be based on the informant's personal observations, not his suspicions or beliefs. If the affidavit lacks an affirmative allegation of the informant's personal knowledge, "the facts supplied must

be so detailed as to support an inference of personal knowledge."

> > Additionally, the affiant must inform the magistrate or judge of some of the underlying circumstances that led the affiant to conclude that the informant was credible or that his information was reliable. An informant's veracity may be established by demonstrating his past reliability, or by independent police corroboration of detailed facts in the informant's story. The personal identity and involvement of the informant may also establish his veracity.... Finally, an informant's admission against his penal interest may be sufficient to establish his veracity in certain circumstances.

> *Jones*, 706 P.2d at 324–25 (citations and footnotes omitted). In describing the *Aguilar–Spinelli* test's application to Alaska cases, our supreme court has also emphasized that "[i]t is imperative under the Alaska Constitution that the magistrate be presented with adequate supporting facts so that he can independently test the confidential informant's basis of knowledge and veracity." *Id.* at 326.

*Carter v. State*, 910 P.2d 619, 623 (Alaska App.1996).

■ For present purposes, it is vital to add to this summary that the existence of probable cause must be determined exclusively from the evidence properly submitted to the issuing magistrate; other information, known to the police but not revealed to the issuing court, cannot be considered. *State v. White*, 707 P.2d 271, 277 (Alaska App.1985).

In the present case, Detective Koch's affidavit was based on a report by an informant who "had seen 50–80 marijuana plants in the [McPhee Street] house two days before." Because Koch's affidavit made it clear that the informant purported to speak from personal knowledge, we assume for argument's sake that the affidavit satisfies the "basis of knowledge" prong of the *Aguilar–Spinelli* test.[3] The remaining prong of *Aguilar–Spi-*

---

3. Lloyd argues that when an informant purports to have personally observed drugs or items that an average person might not be familiar with or readily able to identify, the basis of knowledge prong of *Aguilar–Spinelli* should be construed to require the affidavit to recite sufficient facts to

provide the issuing magistrate with a basis for concluding that the informant was capable of reliably making the disputed observation. Although Professor LaFave endorses Lloyd's proposed interpretation of *Aguilar–Spinelli*, this interpretation appears to represent a minority view

*nelli,* which deals with an informant's credibility, is far more troublesome here.

"Generally, the cases distinguish between two kinds of informants: 'citizen informants' and 'police informants.'" *Effenbeck v. State,* 700 P.2d 811, 813 (Alaska App.1985). *Aguilar–Spinelli*'s credibility prong applies in full force to unnamed informants from the criminal milieu. *Id.* at 813–14. Distrust of police informants is founded on their tendency to report information for pay, for immunity, or for personal advantage or vindication; also a principal concern is the possibility that fictitious reports from unnamed informants will be used as a means of fabricating probable cause. *Id.* at 814.

■ Under the *Aguilar–Spinelli* test, the credibility of a police informant can be established by information showing that the informant has previously given reliable information, by relying on a statement that is against the informant's own penal interest, or "by corroboration of a great many details from the informer's story." *Id.* (quoting 3 W. LaFave, Search and Seizure § 9.3 at 95–96 (1978)). Although information corroborating a police informant's tip need not be independently incriminatory, *Schmid v. State,* 615 P.2d 565, 577 (Alaska 1980), it must relate to the tip in a way that lends substantial credibility to the report of illegality. *See Clark v. State,* 704 P.2d 799, 804 & n. 4 (Alaska App.1985).

■ By contrast, a more relaxed rule applies "[w]hen information is provided by a cooperative citizen, or an informant not from the criminal milieu[,]" since "[a]n ordinary citizen who reports a crime stands on a much different footing" than a police informant. *Erickson v. State,* 507 P.2d 508, 517–18 (Alaska 1973) (footnotes omitted). To establish the credibility of a citizen informant, no showing of prior reliability is required; the police need only verify "some of the details of the information." *Id.* at 518.

In evaluating compliance with *Aguilar–Spinelli*'s credibility prong in the present case, the superior court elected to treat the informant as a "citizen informant." On this basis, the court decided that the corroborating information presented in Detective Koch's affidavit was sufficient to meet the *Aguilar–Spinelli* test. Lloyd argues on appeal that Koch's affidavit contains insufficient information to support the conclusion that the report came from a citizen informant. The state responds that citizen informant treatment was justified because the report was received on the police department's "Crime Stoppers line."

■ Whether a particular informant's credibility should be subject to treatment under the relaxed standards governing citizen informants or the more rigid standards applicable to police informants depends on the extent to which the dangers typically associated with police informants arise in a given case. We have recognized that "[t]he distinction between a citizen informant and a criminal informant does not turn on the bare facts of the informant's past. Rather, ... the informant's status turns on the nature of the informant's involvement with the incident being investigated and his or her motivation for coming to the authorities[.]" *Gustafson v. State,* 854 P.2d 751, 756 (Alaska App.1993) (citing *Erickson,* 507 P.2d at 517). The test is a practical one, based on the totality of the circumstances:

> [T]he law examines the person's connection to the event and his or her probable motive for bringing the information to the police. When a person's primary motive is to obtain an official concession or reap some other personal benefit, the law requires greater corroboration of the person's information. If, however, the individual comes forward without concern for personal benefit, the law requires less corroboration.

*Gustafson,* 854 P.2d at 756–57.

■ Accordingly, to determine what standard of corroboration applies, the issuing

among courts passing on the issue. *See generally* 2 Wayne R. LaFave *Search and Seizure* § 3.3(d) at 146–50 (3d ed. 1996). We are inclined to think that the general appearance of marijuana plants is a matter of relatively widespread knowledge in contemporary Alaska society and that as

a practical matter, when an otherwise trustworthy informant purports to identify personally observed plants as marijuana, there may be little reason to doubt the informant's ability to do so reliably. Nevertheless, our disposition of this case makes it unnecessary to decide this issue.

magistrate must realistically assess the informant's probable motives, as they appear from the information properly before the court. When information concerning the informant's identity and motives identifies the informant as the kind of person who is likely to speak the truth, then the informant may be treated as a citizen informant whose report is presumptively credible and requires only minimal corroboration. However, a finding of citizen informant status requires at least some circumstantial showing of intrinsically trustworthy motivation. Credibility is not presumed by default: when the information available to the magistrate does not actually identify the informant as an apparently well-meaning citizen, and when it otherwise sheds insufficient light on identity and motive to dispel the underlying concerns of *Aguilar–Spinelli*, the informant's status as a citizen informant cannot simply be assumed.

In support of its argument that the informant in this case was properly deemed a citizen informant, the state cites *Beuter v. State*, 796 P.2d 1378 (Alaska App.1990), and *Effenbeck v. State*, 700 P.2d 811 (Alaska App. 1985). *Beuter* and *Effenbeck*, however, dealt with warrantless investigative stops or limited intrusions based on police suspicions of criminal activity. In both cases, the police had received information through anonymous telephone reports made in response to "Crime Stoppers"-like programs that encouraged citizens to make anonymous reports to the police; although *Aguilar–Spinelli* does not formally apply to stop and frisk situations, we discussed the test in these cases by analogy. We pointed out in *Effenbeck*, 700 P.2d at 814, that "courts faced with anonymous informants in contexts similar to this one have been willing to characterize the informant as a citizen informant." Although we initially found this to be "[s]omewhat surprising[ ]," we concluded upon further examination that citizen informant status seemed justified in many such cases because the circumstances surrounding the Crime Stoppers reports eliminated the dangers that ordinarily require police informants to be distrusted. *Id.* at 814–15.

Examination of the totality of the circumstances surrounding the anonymous call in *Effenbeck* led us to find it unlikely that the call was motivated by a desire for pay, for immunity, or for personal advantage or vindication; we further found that "the circumstances virtually eliminate the possibility of police fabrication." *Id.* We thus concluded that the report was sufficiently credible to support a warrantless stop based on reasonable suspicion, particularly in light of the exigencies that led the police to make the warrantless stop. *Id.* at 815.

We relied on *Effenbeck* to justify a warrantless stop under comparable circumstances in *Beuter*, 796 P.2d at 1382. Although we noted that "[t]he anonymous informants in this case do not fall clearly into either of these two groups [of citizen or police informants]," we concluded from the circumstances surrounding the anonymous reports "that the record establishes that the police had sufficient reasonable suspicion to justify a minimal intrusion by having Beuter's car inspected by a drug-detecting dog." *Id.* at 1382.

■ As can be readily seen, neither *Effenbeck* nor *Beuter* stand for the proposition that police informants or informants of unknown or undetermined status can automatically gain citizen informant status by calling a Crime Stoppers number; to adopt such a rule would simply encourage police to channel calls from their regular informants through a Crime Stoppers line. To the extent that these decisions are relevant to a case involving a full search based on probable cause rather than an investigative stop or frisk based on reasonable suspicion, both support the conclusion we have already set forth above: that informant status must be determined by a realistic, case-by-case assessment of the informant's probable motives, as they appear from the information properly before the court.

■ In the context of a case involving a warrant, where the *Aguilar–Spinelli* analysis formally applies, this means that the evidence actually presented to the issuing magistrate must in itself establish informant's status as a citizen informant. Since the issuing magistrate must independently determine informant credibility, facts bearing on credibility must be revealed to the magis-

trate before the warrant is issued; unless they are so revealed, they cannot later be injected to justify citizen informant status. *See White,* 707 P.2d at 277 (probable cause evaluation limited to affidavit and recorded testimony under oath before issuing magistrate).

 Here, the only evidence presented to the issuing judge concerning the status and motives of the caller who reported Lloyd's marijuana grow was that the call was received on "the Crime Stoppers line at the Anchorage Police Dept." No information concerning the Anchorage Crime Stoppers program was given to the court; nor was any information about the nature or circumstances of the call provided. The court was not told whether the informant was named or anonymous, whether any payment or other incentives were asked or offered. The court had no way of knowing if the call was recorded, and nothing before the issuing court provided any assurance that the report could not have been fabricated. As made clear during the pretrial hearing on Lloyd's motion to suppress, much of this information was known to the police and could have been presented to the judge who issued the warrant. But it was not.

In finding that the caller qualified for citizen informant status, and in relying on that finding to uphold the warrant, the superior court deemed the additional information disclosed at the suppression hearing to be significant.[4] The superior court erred in considering this information, since it was disclosed after the fact. The question before the superior court when it reviewed the warrant was not whether the state could prove that the caller was a citizen informant but whether the facts before the issuing court could justify citizen informant status. Given the cursory nature of the affidavit in this case, the question must be answered in the negative: standing alone, the bare fact that the police received their information through the Crime Stoppers line does not support an inference that the caller was a citizen informant.

 It remains to be considered whether the corroborating evidence in this case satisfied *Aguilar–Spinelli*'s test for establishing the credibility of police informants. Detective Koch's affidavit described three sets of corroborating facts. First, the affidavit noted that Lloyd's physical appearance and the physical appearance of the McPhee Street house matched the caller's information. In addition, a car registered to Lloyd was parked in front of the house. At most, however, this information suggests that the Crime Stoppers' caller was acquainted with Lloyd and knew where he lived. "[C]orroboration of public facts or wholly innocuous details" cannot meet the *Aguilar–Spinelli* requirement. *Carter v. State,* 910 P.2d at 624.

Second, the affidavit stated that in January 1993, while maintaining surveillance over large-quantity marijuana sales at a residence located at 841 N. Bliss, Koch had "observed foot traffic between 841 N Bliss and 4618 McPhee." However, the affidavit included no further information connecting the two locations: it failed to indicate the relative location of the two houses, the number of observations or the number of people observed, the extent or nature of the observed activity, or any other circumstances that could conceivably be deemed suspicious. The affidavit's cursory mention of "foot traffic" might encompass something as innocuous as a single sighting of a postal delivery person walking from one house to the next, or something as incriminating as a non-stop flow of drug-laden couriers shuttling their wares from one drug-house to another. The affidavit supplied no factual detail to reveal what Koch actually saw; without this detail, the court had no way to gauge whether Koch's observation of foot traffic belonged at one extreme of this broad spectrum of possibilities, at the other extreme, or somewhere in the middle.

 Detective Koch may well have been convinced that the "foot traffic" he saw had

---

4. For example, the superior court's order denying Lloyd's motion to suppress found it significant to the issue of citizen informant status that "it is documented that an anonymous caller telephoned the Crime Stoppers hot line[,]" that

"there is an actual recorded tip," and that the caller "assert[ed] a desire to remain anonymous[.]" None of these facts were before the issuing court.

some significance. But the significance of what Koch saw was a matter to be determined, not by Koch, but by the judge who was called upon to issue the warrant.[5] "It is imperative under the Alaska Constitution that the magistrate be presented with adequate supporting facts so that he can *independently* test the confidential informant's basis of knowledge and veracity." *State v. Jones*, 706 P.2d 317, 326 (Alaska 1985) (emphasis added). Here, the complete absence of detail deprived the reference to "foot traffic" of any significant corroborative value.

The third set of corroborating facts in Koch's affidavit consisted of information concerning recent electrical consumption at the McPhee Street house. This information, derived from billing records for the six months immediately preceding the search, revealed increasing electrical consumption during the two most recently billed periods—the periods covered by the February and March billings. But ˙nothing was submitted to enable the court to make sense of this raw statistical increase in electrical use.

The affidavit said nothing to indicate whether the McPhee Street house was heated by electricity; it supplied no information tying the increased electrical use to marijuana growing activity; and it gave no baseline for average or "normal" wintertime electrical consumption—or fluctuation in consumption—in homes of comparable size. Furthermore, apart from its conclusory mention that the billing in March increased over billing in January despite "significantly warmer" March temperatures, the affidavit provided nothing to suggest that the increased use reflected in the February and March billings was abnormal.

At best, this conclusory reference to warming temperatures in March is of dubious value, since no information was submitted to show that the March billing reflected March electrical consumption. Indeed, the utility billing records strongly suggest the contrary: the warrant itself was issued in mid-March, and the March billing referred to in the affidavit had been obtained some time prior to the date of issuance. Because the March billing apparently covered electricity used some time prior to the early-March billing,[6] the affidavit's mention of warmer March temperatures had little bearing on the issue of probable cause. In any event, the affidavit said nothing to indicate that the McPhee Street house was even occupied during the early months of winter, when electrical use was low; increased consumption thus might simply have reflected the fact that a tenant had moved into the residence.[7]

In *Carter v. State*, 910 P.2d at 625–26, we emphasized that courts determining probable cause to search for evidence of marijuana growing operations must exercise caution in attributing significance to records of electrical consumption, even when background evidence has been presented to explain the rec-

---

**5.** In its brief, the state repeatedly refers to the portions of the supporting affidavit describing Koch's extensive training and experience in drug enforcement, suggesting that Koch's expertise has some special relevance. This suggestion misses the point that probable cause is to be determined by the issuing magistrate, not the police. Koch did not purport to rely on his expertise to draw any particular conclusions from the "foot traffic" he observed in January 1993; in fact, his affidavit did not assert that he attributed any significance at all to the foot traffic.

**6.** *Cf. Carter v. State*, 910 P.2d at 622 n. 5 (testimony of utility employee indicating that monthly billings—of a different utility than that involved here—actually reflected consumption occurring during the preceding month).

**7.** In this regard it is worthwhile emphasizing that Koch's affidavit indicated that utilities were listed to a person other than Lloyd who had submitted a landlord application for service, thus making it likely that the McPhee Street residence was a rental property. The state asserts that the fact that the house was occupied in January can be inferred from Koch's observation of "foot traffic" between the McPhee and N. Bliss Street residences during that month. As indicated by our prior discussion in the text of this decision, however, information in the affidavit concerning the "foot traffic" observation was so sketchy and devoid of factual detail as to preclude it from being given any particular significance. Moreover, any logical inference as to occupancy is complicated by the apparent uncertainty as to what period of actual consumption is reflected in the month of billing. If, as seems to be the case, the January billing reflects actual December consumption, then the relatively low consumption reflected in the January bill would suggest vacancy in December, when no observations of "foot traffic" were made.

ords and to show that the amount or pattern of consumption they disclose is unusual or "consistent with marijuana growing." We noted in *Carter* that "courts in other jurisdictions have tended to find evidence of unusual electrical consumption to be significant to the overall determination of probable cause only if other solid facts have been presented to the issuing magistrate to indicate that criminal activity is afoot or to eliminate legitimate explanations for the unusual consumption." *Id.* at 626.

*Carter*, of course, is readily distinguishable from the present case. For in *Carter* we considered whether records of electrical consumption in themselves demonstrated probable cause when informants' tips proved wholly conclusory; here we consider the use of electrical records for the more modest purpose of corroborating the credibility of an informant who provides a non-conclusory tip. We do not doubt that records of electrical consumption can be of great benefit in enabling the police to establish informant credibility in cases like Lloyd's. But to be of benefit, the records must be accompanied by information that places them in context and lends them meaning. Devoid of factual context or explanation, a mere showing of increased electrical consumption cannot satisfy *Aguilar–Spinelli*'s corroboration requirement.

We conclude that the credibility of the informant in this case was not established "by independent police corroboration of detailed facts in the informant's story." *State v. Jones*, 706 P.2d at 325. Since no other basis was offered to the issuing court to satisfy *Aguilar–Spinelli*'s credibility prong, we further conclude that reliance on the informant's tip as a basis for probable cause amounted to error. Accordingly, we hold that the superior court erred in denying Lloyd's motion to suppress.

The conviction is REVERSED.