Leon D. RUARO, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10878.

Court of Appeals of Alaska.

July 27, 2012.

Rex Lamont Butler, Rex Lamont Butler & Associates, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

### *OPINION*

COATS, Chief Judge.

Leon D. Ruaro appeals his conviction for misconduct involving a controlled substance in the third degree for possessing cocaine with intent to deliver. The conviction arose after police, acting under the authority of a search warrant, searched a package that was shipped to Ruaro in Ketchikan through Alaska Marine Lines. The package contained one hundred grams of cocaine.

Ruaro appeals, arguing that the testimony which the State presented to the magistrate at the hearing to obtain the warrant was insufficient to establish probable cause. We agree with Ruaro and reverse his conviction.

*Factual and procedural background*

On the afternoon of May 30, 2006, Alaska State Trooper John K. Brown, Jr. appeared before Ketchikan Magistrate Mary P. Treiber to obtain a search warrant for a box addressed to Leon Ruaro. The box was being held at the Ketchikan Alaska Marine Lines ("AML") facility. Brown asserted that he had probable cause to believe that this box contained cocaine.

Trooper Brown stated that earlier that afternoon he had received a phone call from

an officer in the Ketchikan Police Department. That officer stated that Dan Kelly, a supervisor with AML, had reported the arrival of a suspicious box, and that a person named Leon Ruaro was looking for it. Trooper Brown at this point traveled to AML to speak with Kelly directly.

Brown testified that Kelly stated that Ruaro had been receiving packages with AML since August 2005 and had received a total of seven packages between then and May 2006. The previous package Ruaro had received had weighed approximately forty pounds and had "extreme amounts" of tape on it. The current package was taped more than might be typical, but was not abnormally taped. This package weighed eighty pounds. Its label stated that it contained a new computer.

Kelly told Trooper Brown that he believed Ruaro's package was suspicious. He based this conclusion on his years of experience dealing with freight and shipping. He pointed to the extreme amount of strapping tape on Ruaro's previous package, as well as to Ruaro's behavior when picking up that package. Kelly said that Ruaro had called to complain that the previous package was not being delivered in a timely manner. He had also shouted and pounded on the AML front desk, upsetting the employees. Kelly found this behavior suspicious and believed that the package probably contained drugs. Kelly also pointed to Ruaro's pattern of receiving packages; he found it unusual for someone to receive household goods in the periodic or piecemeal manner that Ruaro was receiving them. Trooper Brown said that Kelly had told him, "if you are moving, you want all your items with you at once so it's unusual to ship household goods over a period ... since August of last year." He said Ruaro had received six packages since August of 2005.

Trooper Brown provided more information about Ruaro's agitation over delays in receiving his packages. He relayed Kelly's statements that when Ruaro's last package was to have been delivered in early May, Ruaro became quite upset when the box was not unloaded from the shipping container on the day that Ruaro expected it. Kelly stated that when Ruaro learned he would have to wait until the following morning to pick up his shipment, he became angry and called the president of AML. Ruaro reportedly told the president that he was upset because he wasn't able to get his work documents. Ruaro also said that he was looking for his cell phone (inside the still-unavailable box). Kelly noted that Ruaro had another cell phone available that he used to call the AML president.

Kelly said that Ruaro was also verbally abusive on the present occasion when he called to see if his package was available.

Trooper Brown testified about the conversation he had with Ruaro when Ruaro arrived at the AML facility to pick up the package. Brown asked Ruaro if he could look in the package; Ruaro said he could not. He asked Ruaro if Ruaro knew what was in the package. Ruaro said that it contained "an iPod and some household goods" that "he was having shipped up from a friend." Brown noted that the bill of lading for the package identified Ruaro as the shipper; Ruaro continued to deny shipping the package. Brown also noticed that the bill of lading identified the box's contents as a new computer. When he asked Ruaro why the bill of lading said "computer," Ruaro said that the only computer equipment in the package was his iPod.

Trooper Brown later told the magistrate that Ruaro said that the shipments were connected to the fact that he was moving. But Brown noted that Ruaro had been shipping goods to Ketchikan since at least August 2005, nine months earlier. He also had information suggesting that Ruaro had been in town at least between December 2004 and February 2005.

The officer also explained to the magistrate his efforts to use a drug-sniffing dog to investigate the package. He stated that another investigator had brought his dog to sniff the package. The dog did not alert on the package. Brown explained to the magistrate that it is possible to package drugs in a manner that will evade detection by dogs, and he provided some detail as to how this could be done. He stated that he had not encountered this method frequently but that

he had seen this occur on occasion, especially with marijuana. Brown also stated that the drug dog, Mo, is trained to detect several smells, including cocaine.

Finally, Brown told the magistrate, "I know Ruaro through Crime Stoppers." He then told the magistrate about three previous calls which were made to the Crime Stoppers telephone hotline involving Ruaro. All three calls were anonymous.

The first report was on December 21, 2004. The caller stated that Ruaro, his uncle, and his mother were all cocaine dealers, and that two days earlier the caller had purchased two grams of cocaine from Ruaro at First City, a Ketchikan bar. The second call was on February 17, 2005. The caller stated that on February 24 or 25, Ruaro and his family members would be getting a new shipment of cocaine. The third report was on February 24, 2005. The caller stated that Ruaro had received a cocaine shipment via Alaska Airlines three days earlier and that "there [were] 15 grams of cocaine for sale in the First City parking lot."

Trooper Brown stated that police spoke with Ruaro in late February 2005 about these reports. When they talked with Ruaro, he denied selling drugs. Trooper Brown told the magistrate that law enforcement officers had "tried to investigate" the three Crime Stoppers reports but had been unable to develop enough information to make an arrest. Brown told the magistrate that Ruaro had never been arrested and charged with drug possession.

Brown stated that the one time that law enforcement had contacted Ruaro locally was the February 2005 exchange in which Ruaro denied selling drugs. Brown also said that other officers had seen Ruaro at First City in early 2005. Although Brown had not personally seen Ruaro at First City when the Crime Stoppers reports came in, in December 2004 and February 2005, he did talk to other officers who had seen Ruaro there in that time period.

Magistrate Treiber found probable cause to issue the search warrant. When Trooper Brown served the search warrant, he discov-ered one hundred grams of cocaine hidden in the box inside several bags inside a computer tower.

The State charged Ruaro with misconduct involving a controlled substance in the third degree for possessing cocaine with the intent to deliver.[1] Ruaro moved to suppress the evidence based upon the contention that the warrant was not supported by probable cause. Superior Court Judge Michael A. Thompson denied the motion. In a bench trial before Superior Court Judge William B. Carey, Ruaro was convicted based upon stipulated facts.

*Why we conclude the evidence presented at the search warrant hearing was insufficient to establish probable cause to issue the warrant*

■ The State contends that Ruaro's actions surrounding the receipt of the package on May 30, 2006 (the package that was found to contain cocaine), were suspicious. From AML supervisor Kelly, Trooper Brown had reliable information that Ruaro had received six other packages since August of 2005. Kelly stated that Ruaro's pattern of receiving packages was unusual: "if you are moving, you want all of your items with you at once so it's unusual to ship household goods over a period ... since August of last year." Furthermore, Brown had information from Crime Stopper reports that Ruaro had been in Ketchikan in 2005, information that was corroborated by the fact that the police spoke with Ruaro in late February 2005 about those reports.

The State also argues that Ruaro's statements to Trooper Brown when the officer asked him about the package were suspicious. Ruaro denied that he had shipped the package, even though his name appeared on the package as the shipper. And even though the bill of lading said the package contained a computer, Ruaro told Trooper Brown the package contained an iPod and household goods.

The State also argues that Ruaro's emotional reactions to minor delays in the delivery of his packages were suspicious.

---

1. AS 11.71.030(a)(1).

The State recognizes that because the Crime Stoppers informant (or informants) were anonymous, the veracity of these reports needed to be established by each declarant's past reliability or by independent police corroboration.[2] But the State mostly relies on the Crime Stoppers reports, coupled with the police contact with Ruaro in February 2005, to support the conclusion that Ruaro had been living in Ketchikan since that time. The State points out that, to the extent that the magistrate relied on the Crime Stoppers reports to establish Ruaro's presence in Ketchikan, that information was corroborated both by the prior police contact with Ruaro when they were investigating the Crime Stoppers reports and by Kelly's reports of his contact with Ruaro when Ruaro retrieved packages at AML.

The State indicates that the magistrate only used the Crime Stoppers reports for one other purpose. The State observes that the magistrate "relied on the Crime Stoppers reports only to establish that the type of contraband suspected of being in the package was cocaine." The State "concedes that the reports lacked a sufficient foundation to establish the likely contents of the package." The State goes on to argue that it "was not required to identify the contents [of the package] beyond establishing probable cause to believe [that the package contained] contraband. The other evidence presented to the magistrate was sufficient for that purpose."

In his treatise on search and seizure, Professor LaFave observes that courts have allowed warrants to generally describe property to be seized when the warrant describes illegal drugs such as "narcotic drugs," "any illegal drugs," "marijuana, dangerous drugs, stimulant drugs, and hallucinogenics," "controlled substances," and "narcotics and dangerous drugs and narcotics paraphernalia."[3] But LaFave goes on to observe that "[b]y contrast, a more general reference to items which are contraband in nature but without even identifying their type is insufficient."[4]

It was not unreasonable for the magistrate to conclude that Ruaro's behavior surrounding his receipt of the package was suspicious. And Ruaro's behavior suggested that Ruaro did not want to reveal the contents of the package. But we conclude that the evidence which the State presented at the search warrant hearing was insufficient to establish probable cause that the package contained cocaine.

■ In reaching this conclusion, we recognize that the magistrate's conclusion finding probable cause is entitled to great deference and that we should uphold that finding in doubtful or marginal cases.[5] But, although Ruaro's behavior could certainly be described as suspicious, we fail to see how that suspicious behavior could establish probable cause that his package contained cocaine.

■ The State offers another argument in support of upholding the search. The State points out that the trial court found that "Ruaro offered to open the package while [law enforcement officers] were waiting" for the warrant to be issued. The State argues that this finding indicates that Ruaro agreed to the search and that therefore, even if the warrant was defective, the State was authorized to conduct the search based upon Ruaro's agreement. But the State has not established that Ruaro's offer to open the package was not based upon the fact that the police had obtained a warrant. Furthermore, as Ruaro points out, an offer only to open the package would not authorize the police to conduct the thorough search of items within the package that the police conducted in order to find the cocaine. Consequently, the State's argument that Ruaro voluntarily agreed to authorize the thorough search that the police conducted to find the cocaine is not supported by the record.

*Conclusion*

We conclude that the evidence which the State presented at the search warrant hear-

---

2. *See Carter v. State,* 910 P.2d 619, 623 (Alaska App.1996).

3. *See* 2 Wayne R. LaFave, *Search and Seizure,* § 4.6(b), at 620–21 (4th ed. 2004) (footnotes omitted).

4. *Id.* § 4.6(b), at 621 (footnote omitted).

5. *McClelland v. State,* 928 P.2d 1224, 1225 (Alaska App.1996) (citing *State v. Conway,* 711 P.2d 555, 557 (Alaska App.1985)).

ing was insufficient to support a finding that Ruaro's package contained illegal drugs. We therefore hold that the superior court erred in denying Ruaro's motion to suppress the evidence the police obtained when they served the warrant. It is uncontested that, without this illegally seized evidence, the State presented insufficient evidence to support Ruaro's conviction.

The judgment of the superior court is REVERSED.

MANNHEIMER, Judge, concurring.

I write separately to further clarify my analysis of this case.

As described by Trooper Brown when he applied for the search warrant, Leon Ruaro received an unusual series of packages over a period of months, all shipped to him in Ketchikan via Alaska Marine Lines. On a couple of occasions, Ruaro became incensed and abusive when the Marine Lines failed to promptly off-load a package from its barge, so that Ruaro could pick it up.

An agent of the Marine Lines contacted the police, informed them that another package had arrived for Ruaro, and told them that he (the agent) thought that Ruaro's packages and behavior were suspicious. The police then contacted the state troopers.

Trooper Brown was aware of three prior "crime stoppers" tips suggesting that Ruaro and his family were involved in trafficking cocaine. These tips were anonymous, and there is nothing in the record to show whether these tips represented information received from three different people, or (instead) one person contacting the authorities three times. Trooper Brown told the magistrate that the authorities had investigated these crime stoppers tips, but they had been "unable to develop enough information to arrest [Ruaro]".

Based on the unusual series of packages, based on Ruaro's unusual behavior with regard to a couple of these packages, and based on the three crime stoppers tips, Trooper Brown told the magistrate that he believed there was cocaine inside the package that had recently arrived for Ruaro— "because cocaine is the type of drug that has been associated with Mr. Ruaro in the past". However, the trooper also informed the magistrate that the troopers had subjected this package to a drug-detecting dog (a dog trained to detect cocaine), and that the dog had *not* alerted on the package.

Based on this evidence, and primarily based on Ruaro's behavior and attitude toward the packages, the magistrate concluded that there was "something either quite valuable in these [packages], or [else] drugs."

The magistrate declared that it was "[her] belief" that people who regularly ship packages by barge "are [normally] tolerant" of the delays that inevitably occur from time to time. And for this reason, the magistrate found that Ruaro's behavior—"losing composure and shouting and pounding on the desk at the front counter [of the barge company]"—was suspicious.

The magistrate then declared that, because of Ruaro's suspicious behavior, there was probable cause to believe that the package contained "contraband" of some kind. She further declared that, if the package contained contraband, then that contraband must be cocaine. The magistrate explained that this conclusion was based on the three prior crime stoppers tips: "There's no reason to believe that [the current package contains] other [illegal] substances, because in none of the [prior] investigations done by the Ketchikan Police Department ... has Mr. Ruaro been implicated in [the distribution of] any other substance."

Based on this reasoning, the magistrate concluded that there was probable cause to believe that the package contained cocaine, and she issued a search warrant directing the authorities to seize the package and search it for cocaine.

Now, in its brief to this Court, the State concedes that it was error for the magistrate to rely on the crime stoppers tips when she concluded that there was probable cause to believe that the package contained cocaine:

The magistrate ... relied on the Crime Stopper reports ... to establish that the type of contraband suspected of being in the package was cocaine. The state concedes that [these anonymous] reports

**1238**

lacked a sufficient foundation to establish the likely contents of the package.

However, the State argues that the search warrant was valid even though the search warrant application failed to establish probable cause to believe that the package contained cocaine. Specifically, the State argues that if the information presented to the magistrate was sufficient to establish probable cause to believe that the package contained *some kind of contraband,* then there was no need for the State to identify the contents of the package with any greater level of specificity.

I do not agree with the State's basic premise that the information presented to the magistrate (stripped of the allegations of cocaine trafficking contained in the crime stoppers tips) was sufficient to establish that Ruaro's package contained contraband of some kind.

Ruaro had received an unusual series of packages, and he had engaged in emotional behavior when the delivery of a couple of these packages was delayed. But as the magistrate conceded, these facts could just as readily be explained if the packages contained valuables, or if the packages contained other legitimate items that Ruaro needed on an urgent basis.

Without the crime stoppers tips, there was no particular reason to believe that the packages contained anything illegal. In fact, the failure of the drug-sniffing dog to detect any illegal substances inside the package was an affirmative indication that the package did *not* contain anything illegal.

But even assuming that the State is correct in asserting that the information presented to the magistrate established probable cause to believe that the package contained contraband of some kind, this is *not* sufficient to validate the search warrant. Professor LaFave addresses this topic in his work on search and seizure:

[I]f the purpose [of the warrant] is to seize ... any property of a specified character ... which [is of itself] illicit or contraband, [the warrant need not contain] a specific particular description of the property ... [, and the property] may be described generally as to its nature or character.

Illustrative of the types of descriptions which have been upheld by the courts are ... "gambling paraphernalia"; ... "paraphernalia used in the manufacture of counterfeit federal reserve notes"; "any explosives, explosive materials and parts"; "narcotic drugs"; ... [or] "controlled substances".... *By contrast, a more general reference to items which are contraband in nature but without even identifying their type is insufficient.*

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed. 2004), § 4.6(b), Vol. 2, pp. 620–21 (emphasis added).[1]

By quoting this passage from LaFave, I do not necessarily endorse the proposition that a search warrant in Alaska is valid even if its description of the items to be seized is no more specific than "narcotic drugs" or "controlled substances". I leave that issue for another day.

Rather, my point is that the State is wrong when it suggests that a court can validly issue a warrant authorizing a search for, and the seizure of, "contraband of any kind".

For these reasons, I agree with my colleagues that the search warrant issued in this case is invalid.

---

**1.** Citing *United States v. Morris,* 977 F.2d 677 (1st Cir.1992) ("the catch-all phrase authorizing seizure of 'any other object in violation of the law' is impermissibly broad"); and *People v. Brown,* 96 N.Y.2d 80, 725 N.Y.S.2d 601, 749 N.E.2d 170 (2001) (holding that the description "any other property the possession of which would be considered contraband" is impermissibly broad).