**Shelton L. LANDON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5753.**

Court of Appeals of Alaska.

May 30, 1997.

John C. Pharr, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

The police executed a search warrant at Shelton L. Landon's property and discovered that he was growing a substantial amount of marijuana there. Landon was subsequently convicted of fourth-degree misconduct involving a controlled substance under three different theories (manufacturing more than one ounce of marijuana with intent to deliver, possession of more than one pound of marijuana, and using his dwelling for distribution of marijuana), AS 11.71.040(a)(2), (a)(3)(F), and (a)(5).

Landon appeals his conviction, arguing that the search warrant for his property was issued without probable cause. He also contends that, when he took the stand at his trial, the prosecuting attorney was allowed to cross-examine him outside the scope of the issues raised by his testimony on direct examination. As explained below, we reject both of these contentions and we therefore affirm Landon's conviction.

Landon also appeals his sentence. We conclude that the superior court must reconsider its sentencing decision.

### The search warrant

On March 29, 1994, an anonymous caller contacted the Matanuska–Susitna Crime Stoppers hotline and reported that Landon was operating a marijuana growing operation in his home.

The caller gave the address of Landon's home and provided detailed directions on how to get there. He[1] stated that Landon lived in a light blue, one-story house that had both front and rear entrances, with a fence around the front porch, and with no curtains on the windows. The caller said that Landon owned two adult rottweilers and three rottweiler puppies; he kept these dogs chained at the house.

Finally, the caller stated that there was a second building at the back of the house, not visible from the roadway, which contained Landon's marijuana growing operation. According to the caller, Landon would be harvesting between 200 and 300 marijuana plants in late April or early May. The caller claimed to have seen these plants six to eight weeks ago, when they were two to three feet tall.

The caller explained that he knew all this because he had "worked a couple of growing seasons for Landon, water[ing] plants and even clean[ing] his house". The caller apparently decided to reveal this information to the authorities because he was angry at Landon for "how [he] was treated".

State Trooper Jeannine Santora was assigned to investigate the caller's information. She contacted other officers of the State Troopers' Drug Enforcement Unit, who confirmed that Landon owned property in the same subdivision that the caller had described; these officers also told Trooper Santora that Landon was on probation. Santora then contacted the Department of Corrections probation office in Palmer; the probation officer confirmed that Landon owned rottweilers, and Santora also learned that

---

1. The record does not reveal the caller's sex; the use of "he" is arbitrary.

Landon drove a black BMW with tinted windows.

Using the directions provided by the caller, Santora and another state trooper drove to Landon's house, which matched the description given by the caller: the house was one-story, it was colored light blue, and it had a fence around the front porch. The troopers observed two rottweiler puppies on the front porch. The troopers saw no curtains on the windows, although some side windows had red coverings.

The troopers could see a plywood building in back of the house. A carport was attached to this rear building. Several blue tarps were visible on the ground outside the rear building, and a six- or eight-wheeled vehicle was parked in the carport. The troopers did not see a black BMW at the residence.

A few days later, Santora checked with the Mat–Su Borough to see who was listed as the owner of the property she had visited. Landon was listed as the owner.

Santora checked Landon's criminal history and discovered that he had been convicted in 1985 of possession of dangerous drugs; this conviction was set aside in 1992. Landon had also been arrested in 1991 for possession of marijuana, a charge that was later dismissed.

Santora next contacted the Matanuska Electric Association (MEA) and inquired about the electrical usage at Landon's residence. She was informed that the electricity was in Landon's name and that the usage was above average.

Based on this information, Santora sought a warrant to search Landon's property. There were two witnesses at the probable causing hearing: Trooper Santora (who testified to the facts set out above), and John R. Bogue, the Energy Services Manager for MEA, who testified about Landon's electricity usage.

Bogue testified that, according to MEA records, the electricity usage at Landon's residence was consistently over 200 kilowatt hours per day, regardless of changes in the temperature. This level of usage had been maintained for four consecutive months, beginning in December 1993. In contrast, pre-vious customers at the same address had used between 6 and 35 kilowatt hours per day, depending on the season and whether the residence was actually occupied. For instance, the average electricity use at that residence during the winter of 1992–93 (when a different person had been the subscriber) was 23 to 35 kilowatt hours per day.

Bogue explained that 25 to 35 kilowatts per day would be the expected residential usage level for a house that did not use electric heat. However, if electricity was the source of heat, this level of usage would be "extremely low". The testimony at the hearing indicated that Landon might well have electric heat: Santora testified that she had not noticed a chimney at Landon's residence, or any gas hook-up. Bogue told the magistrate that he did not think Landon's subdivision had access to natural gas.

However, Bogue told the magistrate that even if Landon's house had electric heat, Landon's pattern of electricity usage was still unusual because the level of usage did not vary according to outside temperatures. Bogue testified that, if Landon's high usage of electricity was due to the use of electric heat, one would expect to see a major decrease in the amount of electricity used at the house as temperatures increased during the spring months. Landon's level of usage remained invariant.

Bogue testified that, in his experience, the remaining explanation for such high electricity usage was indoor marijuana cultivation. Bogue explained that marijuana growing operations tend to use high intensity lighting systems comprised of 1,000–watt bulbs (plus ballasts that consume another 200 watts per bulb). Generally, these growing lights are kept on for 12 to 18 hours each day, thus consuming a great deal of electricity. Bogue told the magistrate that he had encountered past instances of similar unexplained high electricity usage, and in every case but one the explanation had turned out to be marijuana cultivation.

Magistrate David Zwink found that there was probable cause to believe that a marijuana growing operation was housed at Landon's residence, and he therefore issued a

search warrant for the property.[2] Landon asserts that the facts recited above do not constitute probable cause, and therefore all evidence seized pursuant to the warrant should be suppressed.

■ When (as in Landon's case) the State seeks to establish probable cause for a warrant by relying on hearsay information, the sufficiency of that hearsay is judged using the *Aguilar/Spinelli* test. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *State v. Jones*, 706 P.2d 317, 324–25 (Alaska 1985). Under this test, a court must examine the basis of the hearsay informant's knowledge and the hearsay informant's credibility.

■ Landon concedes that the amount of detail furnished by the anonymous informant was sufficient to justify the inference that the informant possessed personal knowledge of what he told the police. Thus, the first prong of the *Aguilar/Spinelli* test is satisfied. *Spinelli*, 393 U.S. at 416–17, 89 S.Ct. at 589, 21 L.Ed.2d at 643–44; *Draper v. United States*, 358 U.S. 307, 312–13, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 331–32 (1959); *Schmid v. State*, 615 P.2d 565, 574–75 (Alaska 1980). The real question in this case is whether the informant's credibility was sufficiently established.

■ One of the ways an informant's credibility can be established is through evidence that he or she "is among those persons whom courts presume to be credible"—generally, police officers or "citizen informants". *Stam v. State*, 925 P.2d 668, 670 (Alaska App.1996). An informant's status as either a "police informant" or a "citizen informant" for *Aguilar/Spinelli* purposes "turns on the nature of the informant's involvement with the incident being investigated and his or her motivation for coming to the authorities". *Gustafson v. State*, 854 P.2d 751, 756 (Alaska App.1993). The informant in Landon's case shares the

qualities of both a "citizen" and a "police" informant.

The informant in this case was anonymous. However, as this court noted in *Effenbeck v. State*, 700 P.2d 811, 814 (Alaska App.1985), courts often treat anonymous informants as "citizen informants" because the informant's anonymity practically ensures that they will not receive pecuniary reward or official concessions in exchange for their information.

The informant in this case also declared that he decided to report Landon's illegal activities because he had previously helped Landon cultivate the marijuana and Landon had treated him badly. While the informant's self-declared ill-will toward Landon might in some cases counsel skepticism of his report, here the informant explained that his animosity toward Landon stemmed from his experience as Landon's employee—thereby conceding his own involvement in the criminal activity. Moreover, the informant provided a detailed description of the criminal enterprise. If the police followed the informant's tip and uncovered the marijuana growing operation, it was at least conceivable that the investigative trail would thereafter lead back to the informant. These factors can be interpreted as bolstering the informant's credibility. *See State v. Bianchi*, 761 P.2d 127, 130–31 (Alaska App.1988) (stating that an informant's detailed statements against penal interest satisfied the second prong of *Aguilar/Spinelli* ).

Thus, while the informant in this case may not be the traditional "citizen informant" who needs only minimal corroboration, *see Erickson v. State*, 507 P.2d 508, 517 (Alaska 1973), the magistrate could reasonably extend more credibility to this informant than one would to the traditional "police informant". However, such an informant's credibility would still need to be corroborated before his tip could constitute the probable cause necessary to support a search warrant.

**2.** The troopers executed the search warrant shortly before 8:00 p.m. on the evening of May 4, 1994. Upon entering the rear building, they discovered a marijuana growing operation, with 177 marijuana plants in their budding stage. They also discovered three 1,000–watt halide lamps, set on a rotating, motorized arm to simulate the effect of the sun, as well as two stationary lights over the plants. The estimated weight of the plants, after drying, was between six and seven pounds.

■ The second prong of *Aguilar/Spinelli* can be satisfied when the police independently corroborate portions of the informant's tip. *Carter v. State*, 910 P.2d 619, 623–24 (Alaska App.1996); *Stam v. State*, 925 P.2d at 670. The police need not corroborate everything the informant says. In particular, the police need not independently corroborate the informant's ultimate incriminating assertion (here, that Landon was surreptitiously growing marijuana inside a building). *Schmid*, 615 P.2d at 576–77. However, it is not sufficient for the police simply to corroborate innocuous, readily available public information, such as the fact that a suspect lives at a particular address. *See Jones*, 706 P.2d at 325; *Stam*, 925 P.2d at 671 (police corroboration of an informant's description of "the location and physical layout of [a suspect's] property" was held insufficient to establish the informant's credibility); *Carter*, 910 P.2d at 624 ("corroboration of public facts or wholly innocuous details" cannot meet the *Aguilar/Spinelli* requirement).

Here again, Landon's case presents a borderline situation. Leaving aside the State's evidence of Landon's electricity usage (which we will discuss next), the state troopers were able to verify many details of the informant's tip, but not the incriminating assertion that Landon was conducting a marijuana cultivation operation in the rear building. It might be argued that all of these corroborated details were merely "public information", information that could be gleaned by any attentive observer who visited Landon's property. *See Stam*, 925 P.2d at 671 (police corroboration of the location and physical layout of the suspect's property did not satisfy the second prong of *Aguilar/Spinelli* ). Nevertheless, the corroborated detail in this case went well beyond Landon's address and the physical layout of the buildings on his property. The troopers corroborated details such as the curtainless windows and the rottweiler puppies. While not enough in themselves to establish the informant's credibility, these details can legitimately figure in the *Aguilar/Spinelli* calculus.

We now turn to the evidence of Landon's electricity usage. In two recent cases, this court has ruled that evidence of the level of electricity usage at a suspect's property did not sufficiently corroborate allegations that the property was being used for the cultivation of marijuana. *Lloyd v. State*, 914 P.2d 1282, 1289–1290 (Alaska App.1996), and *Carter v. State*, 910 P.2d 619, 625–26 (Alaska App.1996). We conclude, however, that Landon's case is distinguishable from *Lloyd* and *Carter.*

In *Carter*, the police presented evidence of the defendant's "unusual consumption" of electricity. 910 P.2d at 622. However, aside from the defendant's electrical records, the police presented only "conclusory, anonymous tips of drug-related activity". *Id.* at 626. We held that this combination was not sufficient to establish probable cause. *Id.*

*Lloyd* presented a more sophisticated issue: whether electrical records might be used "for the more modest purpose of corroborating the credibility of an informant who provides a non-conclusory tip". 914 P.2d at 1290. In *Lloyd*, the informant's tip was more detailed, but the only corroborating evidence provided by the police was evidence of a "raw statistical increase in electrical use" at the defendant's property. *Id.* at 1289. We recognized that evidence of electricity usage "[could] be of great benefit in . . . establish[ing] informant credibility in cases like Lloyd's." *Id.* at 1290. However, we cautioned that in order for such evidence to have corroborative force,

> the [utility] records must be accompanied by information that places them in context and lends them meaning. Devoid of factual context or explanation, a mere showing of increased electrical consumption cannot satisfy *Aguilar–Spinelli* 's corroboration requirement.

*Lloyd*, 914 P.2d at 1290.

Landon's case presents an instance in which the informant's tip was substantial, not conclusory, and the evidence of Landon's electricity usage was fleshed out sufficiently to corroborate the informant's tip. The testimony of John Bogue established that the electricity was in Landon's name, that Landon's level of electricity usage at the property consistently exceeded 200 kilowatts per day, and that previous occupiers of the property had used much less electricity (about

one-sixth of that amount). Bogue conceded that similar high levels of usage would be expected if Landon's buildings were heated by electricity, but one would not expect the same pattern of usage—*i.e.*, consistent levels of 200 kilowatts per day, month after month, regardless of changes in the outside temperature.

Bogue explained some of the mechanics of indoor marijuana cultivation, and why a marijuana growing operation would lead to the level of electricity consumption shown at Landon's property. Bogue further testified that, based on his past experience with similar high levels of electricity consumption, it was quite likely that the explanation was marijuana cultivation.

In short, Bogue's testimony provided a reasoned basis for drawing conclusions from the level of electricity usage at Landon's property. Bogue's testimony did not exclude innocent explanations for Landon's high consumption of electricity. However, "probable cause" does not require an affirmative negation of all possibilities consistent with innocence. *Carter*, 910 P.2d at 625–26. By providing a context for evaluating Landon's high level of electricity consumption, Bogue's testimony raised a reasonable inference that the anonymous informant's tip was credible. This inference, in conjunction with the other factors noted above, provided sufficient corroboration of the informant's tip to satisfy the second prong of the *Aguilar/Spinelli* test, thus establishing probable cause to believe that Landon was using his property to grow marijuana. We therefore uphold the search warrant for Landon's property.

■ Landon's second argument on appeal is that he was subjected to improperly broad cross-examination when he took the stand at his trial. Originally, Landon had waived his right to testify; his attorney presented the defense case without calling Landon. However, after the State rested its rebuttal case, Landon's attorney sought the trial judge's permission for Landon to take the stand in surrebuttal, and the judge allowed Landon to testify.

Landon testified that, even though he was the owner of the property, he did not reside there. Landon asserted that he rented out both of the buildings (the house and the rear building) to a man who gave his name as "Charles Brown" but who was actually named Jerry Rose.

On cross-examination, the prosecutor asked Landon if he had ever gone into the rear building while it was rented to Brown/Rose, or if he had ever touched the equipment that was put in that rear building. Landon answered that he had not. The prosecutor then asked Landon how his fingerprint had come to be found on one of the grow lamps in the rear building. The prosecutor also asked Landon to explain how a speeding ticket issued to Landon and a monthly planner with Landon's name on it had come to be found in the front house. The prosecutor also asked Landon to explain why Landon's dogs were at the house, and why the telephone was listed in his name.

On appeal, Landon argues that many of these questions were beyond the scope of his testimony on direct. They were not. Landon testified that he neither occupied nor used the buildings on his property, but instead rented these buildings to someone else. Landon presented this testimony to show that he was not aware of, and did not participate in, the marijuana growing operation that was found on his property. On cross-examination, the prosecutor asked Landon to address various circumstances that seemed to be inconsistent with Landon's claim that he did not use those buildings. These questions were proper.

Under Alaska Evidence Rule 611(b), cross-examination is "limited to the subject matter of the [witness's testimony on] direct examination and matters affecting the credibility of the witness". As applied to defendants in criminal cases who take the stand (*i.e.*, those who waive their right not to testify), this rule is generally construed to mean that a defendant is subject to cross-examination "only to the extent necessary to fairly test the statements made [during] direct examination and [the] inferences that might be drawn from such statements". Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed. 1994), Rule 611, pp. 949–950. In Landon's case, the

prosecutor's questions were manifestly relevant to testing Landon's assertions that he did not occupy or use the buildings on his property.

For these reasons, we affirm Landon's conviction for fourth-degree misconduct involving a controlled substance. We now turn to Landon's sentence appeal.

Landon's offense is a class C felony. AS 11.71.040(d). Landon, as a second felony offender, was subject to a 2–year presumptive term. AS 12.55.125(e)(1). Superior Court Judge Beverly W. Cutler found two aggravating factors under AS 12.55.155(c): (c)(16)—that Landon's conduct was designed to obtain substantial pecuniary gain, while the risk of prosecution and punishment for this conduct was slight; and (c)(17)—that Landon's offense constituted one of a series of criminal offenses committed in furtherance of illegal business activities from which Landon derived a major portion of his income.

Based on these two aggravating factors, Judge Cutler added a suspended year's imprisonment to Landon's sentence; that is, she sentenced Landon to 3 years' imprisonment with 1 year suspended. On appeal, Landon asserts that there was no evidentiary basis for the two aggravators, and thus he should have received the unadjusted presumptive term (2 years to serve).

■ With regard to aggravator (c)(16), the record shows that Landon had over 175 marijuana plants which, when dried, would yield six or seven pounds of marijuana. Moreover, the prosecutor asserted (without contradiction) that if those plants had been allowed to mature, they would have yielded over 40 pounds of marijuana. The prosecutor also asserted (again, without contradiction) that the price for a pound of marijuana was $3,600.00. Thus, Landon could expect a harvest worth more than $160,000.00. This amount of money clearly qualifies as "substantial pecuniary gain".

■ The question then becomes whether Landon's risk of prosecution and punishment was slight. Judge Cutler noted that a sub-

stantial number of people in the Matanuska Valley (upward of four dozen, according to Judge Cutler) are prosecuted each year for growing marijuana for commercial purposes. However, Judge Cutler found that, "notwithstanding [this] fact" (*i.e.*, the substantial number of prosecutions), the risk of prosecution for commercial cultivation of marijuana was still slight because sales of marijuana are "done in private, and [the marijuana] is sold to willing customers".

Judge Cutler's finding is problematic in two ways. First, by asserting that the risk of prosecution is slight despite the fact that four dozen people are prosecuted each year for this crime, Judge Cutler appears to have implicitly found that hundreds of people are growing marijuana for commercial purposes in the Matanuska Valley, and that these people go undetected by a network of undercover officers, paid informants, and special law enforcement units set up to investigate the commerce in illegal drugs. The record in this case contains no information to support such a conclusion.

Second, the legislative history of AS 12.55.155(c)(16) suggests that the legislature had a different category of offense in mind when it enacted aggravator (c)(16). Aggravating factors (c)(16) and (c)(17) were added to AS 12.55.155 by 1980 SLA ch 102, § 40. The commentary to this section of the session law declares that the legislature intended these two aggravators to be applied to "white-collar" criminals. *See* 1980 Senate Journal, Supplement No. 44 (May 29, 1980), p. 25. "White-collar" crimes are generally defined as offenses involving embezzlement, forgery, or fraud.[3] One of the main reasons there is a low risk of prosecution and punishment for these crimes is that the victims often do not realize that a crime has occurred.

Landon's crime did not involve fraud or deceit, nor did Landon surreptitiously steal anyone's property. That is, Landon's offense is not within the normal definition of "white-collar" crime. It is true that commerce in

---

3. White-collar crime: "a crime [such] as fraud, embezzlement, etc., committed by a person in business, government, or a profession in the course of occupational activities." *Webster's New World Dictionary of American English* (Third College Edition, 1988), p. 1523.

marijuana generally takes place in private between two consenting persons; assuming neither of the participants is a police agent, the participants are unlikely to report the crime to the authorities. However, despite this inherent impediment to the reporting and prosecution of marijuana cases, the legislative history of aggravator (c)(16) suggests that the aggravator was aimed primarily at a different category of crime.[4]

We recognize that, even though the legislature's commentary to aggravator (c)(16) focuses on white-collar crimes, other cases potentially may arise outside the white-collar context in which the nature of the offense and the defendant's conduct in committing the offense make it possible for the State to prove the elements of this aggravator. Be that as it may, the record in Landon's case does not contain clear and convincing evidence that Landon faced only a slight risk of prosecution and punishment for his commercial cultivation of marijuana. Given our conclusion that the State failed to present clear and convincing evidence of aggravator (c)(16) in Landon's case, we need not decide the extent to which a sentencing judge might be justified in applying aggravator (c)(16) outside the province of white-collar crimes. We hold only that the sentencing court was clearly erroneous in finding this aggravator applicable to Landon. *Lepley v. State*, 807 P.2d 1095, 1099 n. 1 (Alaska App.1991).

We now turn to aggravator (c)(17). Aggravator (c)(17) is established if the State shows that the defendant's crime was "one of a continuing series of criminal offenses", and if the State further shows that this continuing series of offenses was "committed in furtherance of illegal business activities from which the defendant derive[d] a major portion of [his or her] income". Examining each of these elements in turn, we conclude that neither was proved.

Landon was convicted, in essence, of growing marijuana for sale. In its sentencing argument, the State suggested that Landon's operation had been going on for some time. It is unclear, however, whether a single long-standing growing operation would qualify as "one of a continuing series of criminal offenses".

The State also suggested that there was at least some evidence that Landon had operated other growing operations at other locations. Such evidence could conceivably establish that Landon's present growing operation was one of a series of similar offenses. However, Judge Cutler made no finding with respect to the State's assertion. Indeed, she made no finding at all with respect to this first element of aggravator (c)(17).

With regard to the second element (that Landon derived a major portion of his income from growing marijuana), the prosecutor at sentencing pointed to a substantial body of evidence that Landon enjoyed a level of affluence that was apparently inexplicable by his employment history. However, Judge Cutler made no findings with respect to the State's assertions. Instead, she declared that

[the] proof of the pudding ... is the fact that here we [have] Mr. Landon [represented by] a public defender after making all this money, and making it illegally. Yes, it clearly shows that most of his income was from [drug-dealing]. If he had

---

4. We note a further potential problem in Judge Cutler's ruling. Judge Cutler found that aggravator (c)(16) applied to marijuana sales because the people who know about these sales are unlikely to report the sales to the authorities. Although *Judge Cutler was thinking of* drug offenses, this same rationale might easily be employed to increase the punishment for violations of any unpopular law—any law that the community believed was unfair or represented an improper intrusion into citizens' private lives.

Using this rationale, the government might argue that "the risk of prosecution and punishment" for a particular offense "is slight" whenever citizens often refuse to cooperate with official efforts to investigate that offense, or whenever grand juries often decline to indict people for that offense, or whenever trial juries often refuse to convict people of that offense. While it is perhaps conceivable that the legislature intended aggravator (c)(16) to be used to enhance the punishment for defendants who violate unpopular laws, we are reluctant to assume such a legislative intent. Certainly, *no such intent appears in the commentary to* aggravator (c)(16).

significant other income, he wouldn't need a public defender here right now.

A sentencing judge treads perilous ground when she relies on the fact that a defendant has obtained counsel at public expense as affirmative evidence of the defendant's criminality. Arrest and pre-trial imprisonment are quite capable of disrupting the finances of both the guilty and the innocent, and the costs of private counsel in a felony trial are beyond the financial means of many, be they guilty or innocent. A sentencing judge can not assume, simply because a defendant accused of a commercial crime is unable to afford private counsel, that a major portion of the defendant's income must be attributable to criminal activities. The mere fact that Landon was represented by publicly-funded counsel did not constitute clear and convincing evidence of Landon's past participation in a continuing criminal enterprise; similarly, this fact did not constitute clear and convincing evidence that a major portion of Landon's income was derived from a continuing criminal enterprise.

For these reasons, we vacate the superior court's finding of aggravators (c)(16) and (c)(17). Landon is entitled to be re-sentenced. If the State again attempts to establish aggravator (c)(16) or aggravator (c)(17), that renewed litigation must be governed by this opinion.

Landon's conviction is AFFIRMED, but his sentence is VACATED and this case is remanded to the superior court for re-sentencing. We do not retain jurisdiction of this case.