Lawrence D. MOBERG, Appellant,

v.

MUNICIPALITY OF ANCHORAGE, Appellee.

No. A–9390.

Court of Appeals of Alaska.

Jan. 26, 2007.

---

**58.** AS 08.18.151.

Stephanie Patel, Law Offices of Dan Allan, Anchorage, for the Appellant.

John E. McConnaughy III, Deputy Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Lawrence D. Moberg appeals his conviction for misdemeanor driving under the influence.[1] Moberg was convicted of this offense based on his involvement in a traffic accident, and also based on the result of a blood alcohol test conducted by the Alaska Native Medical Center (the hospital to which Moberg was taken following the traffic accident).

Moberg contends (under various legal theories) that the district court should not have allowed the Municipality to introduce evi-

---

1. Anchorage Municipal Code § 09.28.020.

dence of the result of the blood alcohol test conducted by the hospital. For the reasons explained here, we conclude that none of Moberg's arguments has merit, and we therefore affirm his conviction.

*Underlying facts*

On August 6, 2003, Moberg was admitted to the Alaska Native Medical Center for treatment of injuries he had just suffered in a motor vehicle accident. This accident occurred when Moberg, who was driving a motorcycle, crashed into the rear of a car that had slowed or stopped because of backed-up traffic.

Moberg suffered a fractured leg, and the hospital staff also feared that he might have a head injury. As part of their treatment of Moberg, the hospital staff took a sample of his blood and tested it for, among other things, the presence of alcohol. Moberg's blood alcohol level was .194 percent—more than twice the legal limit for operating a motor vehicle.

After Moberg was taken to the hospital, an Anchorage police officer arrived at the hospital to interview Moberg. The officer noticed that Moberg had red and watery eyes, and that there was an odor of alcoholic beverages upon his person. Moberg acknowledged that he had been drinking, but he declared that he had been drinking less than the officer was "probably thinking". Moberg then invoked his right to an attorney.

The officer did not arrest Moberg. However, the officer gave Moberg a police case number, as well as a notice describing Moberg's duty under Alaska's financial responsibility law.

Following his interview with Moberg, the officer asked the hospital staff if they were going to draw Moberg's blood, and if they were going to test the blood for the presence of alcohol. The hospital staff informed the officer that they had already drawn Moberg's blood, and that they would be testing it for alcohol.

(The district court later took judicial notice that it was "standard hospital procedure to draw blood and test it for the presence of alcohol ... in cases where there are injuries such as [Moberg] had".)

More than three months later, on November 14, 2003, the Anchorage police obtained a search warrant for Moberg's medical records at the Alaska Native Medical Center. As noted above, the hospital records showed that Moberg's blood alcohol level following the accident was .194 percent.

Two weeks later, on November 29, 2003, the Municipality of Anchorage filed a DUI charge against Moberg, and the district court issued a warrant for his arrest.

Moberg was arrested on March 20, 2004. Approximately two months later, on May 14, 2004, Moberg's attorney contacted the Alaska Native Medical Center and asked them to provide a sample of Moberg's blood from August 6th (the date of the accident). The hospital informed Moberg's attorney that they no longer had a sample of Moberg's blood. The hospital explained that they do not retain patients' blood samples for longer than seven days unless someone expressly asks them to do so.

The following month, on June 16, 2004, Moberg's attorney filed a motion asking the district court to dismiss the DUI charge or, in the alternative, to suppress the blood test result. Moberg's theory was that, because of the Municipality's delay in charging Moberg with DUI, Moberg had lost the opportunity to ask the hospital to retain a sample of his blood for re-testing. District Court Judge Brian K. Clark denied Moberg's motion.

Six months later, on December 27, 2004, Moberg's attorney filed a second motion to suppress the blood test result. In this second motion, Moberg argued that the test result was inadmissible because the hospital's method for blood testing did not comply with the foundational requirements specified in the Alaska statutes and regulations governing the use of blood tests at a criminal trial.

At the same time, Moberg's attorney asked the district court to suppress Moberg's medical records from the Alaska Native Medical Center (the records which contained the blood test result). As explained above, these records were obtained by search warrant. Moberg argued that the affidavit in support

of this search warrant failed to establish probable cause that Moberg had committed an offense.

District Court Judge Mary Anne Henry denied both of these latter suppression motions on May 11, 2005.

A jury later convicted Moberg of driving under the influence.

*Moberg's argument that his case should be dismissed, or that evidence of his blood alcohol level should be suppressed, because of pre-accusation delay*

■ Moberg argues that the district court should have dismissed his case because of the Municipality's delay in filing the DUI charge. Moberg contends that, had he been charged with DUI immediately following the accident, he would have known to contact the hospital and ask them to retain a sample of his blood within the seven-day period in which the hospital normally kept its patients' blood samples.

The first obstacle to Moberg's pre-accusation delay argument is the fact that the Alaska Native Medical Center had a policy of retaining patients' blood samples for only seven days. This means that, in order to prevail in his claim of pre-accusation delay, Moberg would have to show that the Municipality had no investigative and/or screening reason for waiting as little as seven days to charge Moberg with DUI. As Judge Clark noted when he denied Moberg's motion, Moberg presented "[n]othing ... [to meet] his burden of demonstrating that a delay of [as little as] seven days was unreasonable".

The second obstacle to Moberg's pre-accusation delay argument is the rule that a defendant who seeks dismissal of criminal charges because of pre-accusation delay must show that their ability to defend the case was prejudiced on account of the delay.[2] Here, Moberg suggests that he might have been able to re-test his blood sample if the Munici-

pality had filed the charge more quickly, but Moberg has failed to present any evidence suggesting that (1) the blood sample could actually have been re-tested if he had known to ask for it sooner, or (2) that re-testing of the blood sample would have yielded any evidence favorable to his defense.

Moberg seeks to circumvent this difficulty by arguing that the loss of this physical evidence, standing alone, constitutes the prejudice required for a dismissal based on pre-accusation delay. That is, Moberg argues that the law does not require him to show a reasonable possibility that re-testing the blood sample would have yielded evidence favorable to him.

■ Moberg's argument is incorrect. Even when the police, through negligence, have lost or failed to preserve physical evidence, a defendant must show that the evidence, if preserved, might have led the jury to entertain a reasonable doubt about the defendant's guilt.[3]

We acknowledge that in *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976), our supreme court adopted a different standard for DUI cases where the government forces an arrestee to take a breath test but then fails to preserve a breath sample for re-testing and otherwise fails to offer the arrestee another method of "cross-examining" the government's breath test (for example, offering the arrestee an independent blood test).[4] In such cases, *Lauderdale* holds, the fact that the defendant had no opportunity to verify the government's breath test result means that the defendant's right of confrontation has been abridged; thus, the defendant is entitled to suppression of the government's breath test result without any need to show that a re-testing of the breath sample or a contemporaneous independent blood test would have yielded evidence favorable to the defense. *Id.,* 548 P.2d at 381–82.

---

**2.** *State v. Mouser,* 806 P.2d 330, 336 (Alaska App.1991); *York v. State,* 757 P.2d 68, 70 (Alaska App.1988).

**3.** *Catlett v. State,* 585 P.2d 553, 557–58 (Alaska 1978); *Torres v. State,* 519 P.2d 788, 795–97 (Alaska 1974).

**4.** *See Anchorage v. Serrano,* 649 P.2d 256, 258 n. 5 (Alaska App.1982).

But the blood alcohol evidence in Moberg's case was not derived from a government-mandated or government-controlled breath test. Instead, this evidence was the result of a blood test conducted by hospital personnel for medical reasons. In *St. John v. State,* 715 P.2d 1205 (Alaska App.1986), we held that the *Lauderdale* rule does not apply to blood tests conducted by hospital personnel for medical reasons,[5] and we further held that, in such circumstances, a defendant seeking a reversal of a DUI conviction must show "that preserving a blood sample for a retest by [the defense] would probably have affected the outcome of [the] trial".[6]

Consequently, Moberg is not entitled to the automatic suppression rule of *Lauderdale.* Rather, his case is governed by the general rule that a defendant seeking dismissal of criminal charges based on pre-accusation delay must make an affirmative showing of prejudice. In Moberg's case, as in *St. John,* "[t]here is no evidence, direct or circumstantial, that the tests performed [on the blood] were in any way inaccurate or that a retest by someone else would have resulted in exculpatory evidence."[7]

For these reasons, we uphold the district court's denial of Moberg's pre-accusation delay motion.

And, for these same reasons, we reject Moberg's related argument that the Municipality had (and violated) a duty to direct the Alaska Native Medical Center to preserve a sample of Moberg's blood beyond the hospital's normal seven-day retention period.

We additionally note that, when the district court ruled on Moberg's suppression motion, the district court expressly found that Moberg, after being interviewed by the police officer about the traffic accident, and after being questioned about his drinking, was aware that he was being investigated for a criminal offense and "that [the alcohol content of his] blood might be used in a criminal prosecution".

Because of the district court's finding on this question of fact, Moberg's case is also governed by our decision in *Bradley v. State,* 662 P.2d 993 (Alaska App.1983). In *Bradley,* we held that the result of a hospital blood test was admissible against the defendant, even though the state had not preserved a sample, because "the blood sample was taken by[,] and was in the possession of[,] an independent entity ... [and because] both the defendant and the [government] had the opportunity to preserve the sample." *Id.,* 662 P.2d at 995.

See also *Prenesti v. State,* 594 P.2d 63 (Alaska 1979), where the Alaska Supreme Court rejected, on similar grounds, a claim of pre-accusation delay. The defendant in *Prenesti* asserted that he had been prejudiced by the State's delay in charging him "because ... he was unable to locate several possible eyewitnesses to the incident who might have exonerated him". *Id.,* 594 P.2d at 64. The supreme court responded: "[W]e agree with the superior court that the loss of these witnesses was due to Prenesti's failure to exercise due diligence in his own behalf. He became aware that he was the subject of a police investigation two months after the incident, but did not hire a lawyer until three months after that time or an investigator until seven months had passed." *Id.* at 65.

Under the supreme court's decision in *Prenesti* and our decision in *Bradley,* the fact that Moberg knew that he was being investigated by the police, and that his blood might contain relevant evidence, means that Moberg was obliged to take action himself if he wished the hospital to preserve his blood (or furnish him with a sample of his blood) for later re-testing.

*Moberg's argument that evidence of his blood alcohol level was inadmissible because the hospital failed to adhere to the testing methods specified by the Department of Public Safety in 13 AAC 63.110*

Under the law of the State of Alaska (AS 28.35.033) and the law of the Municipality of

---

5. *St. John,* 715 P.2d at 1211. *See also Russell v. Anchorage,* 706 P.2d 687, 693 (Alaska App.1985) (holding that a defendant's right to an "independent" blood alcohol test means the right to a test that is "not subject to [government] manipulation").

6. *St. John,* 715 P.2d at 1212.

7. *Id.*

Anchorage (AMC 09.28.023), a driver is presumed to be under the influence of alcohol if a test of the driver's breath or blood yields a blood alcohol level of .08 percent or higher.[8] Conversely, a test result of .04 percent or lower creates a presumption that the driver was not under the influence of alcohol.[9] And a test result between .04 percent and .08 percent creates no presumption either way.[10]

Both the state statute and the Anchorage ordinance declare that, "[t]o be considered valid under the provisions of this section"— *i.e.*, valid for purposes of creating these presumptions—"the chemical analysis of the person's breath or blood [must] have been performed according to methods approved by the [Alaska Department of Public Safety]".[11]

Relying on this latter provision of the municipal ordinance, Moberg asked the district court to exclude the result of his hospital blood test. Moberg argued that the hospital failed to follow the testing procedures established by the Alaska Department of Public Safety by failing to retain a sample of Moberg's blood long enough for Moberg's attorney to have the blood re-tested after Moberg was charged with DUI.

*(a) The regulation at issue, the precise nature of Moberg's argument, and the district court's ruling*

The blood testing procedures in question are codified in 13 AAC 63.110, "Collection and handling of blood samples". This regulation, promulgated by the Department of Public Safety, declares: "The following procedures must be followed to collect and retain a blood sample collected under AS 28.35.033 or 28.35.035":

(1) the blood sample must be collected by a physician, nurse, laboratory technician, or other qualified person;

(2) the blood sample must be collected by medically acceptable means as soon as feasible after an alleged offense, using a clean hypodermic needle and syringe, or other appropriate collection device;

(3) if feasible, sufficient blood should be collected to permit duplicate determinations;

(4) the blood sample must be deposited into a clean container; if feasible, the blood should be mixed with an anticoagulant and a fluoride preservative;

(5) if feasible, a sample of blood awaiting analysis should be stored in a refrigerator except for periods of time required for transportation; [and]

(6) the identity and integrity of a sample must be maintained from the time of collection through analysis and reporting.

Many of these requirements are directed toward ensuring that the blood is collected and stored in a manner that assures the integrity of the sample and the accuracy of the test. But Moberg did not question the hospital's procedures in this regard. That is, Moberg did not argue that the hospital's procedures cast doubt on the integrity of the blood sample or the accuracy of the testing itself. Rather, Moberg argued that the hospital failed to comply with requirement (3): the requirement that, "if feasible, sufficient blood should be collected to permit duplicate determinations".

It is important to note that Moberg's argument was not based on the wording of requirement (3), but rather was based on an extrapolation from that wording.

Requirement (3), on its face, speaks only to the *amount* of blood that must be drawn. This amount must be "sufficient ... to permit duplicate determinations". But Moberg did not argue that the amount of blood drawn by the Alaska Native Medical Center was insufficient to permit re-testing. Instead, Moberg argued that the hospital violated requirement (3) by failing to *retain* the blood sample long enough so that Moberg could have it retested after he was charged with DUI.

Moberg's precise contention is not spelled out clearly in the appellate briefs. However, the nature of Moberg's argument was clari-

---

**8.** AS 28.35.033(a)(3); AMC 09.28.023(A)(3).

**9.** AS 28.35.033(a)(1); AMC 09.28.023(A)(1).

**10.** AS 28.35.033(a)(2); AMC 09.28.023(A)(2).

**11.** AS 28.35.033(d); AMC 09.28.023(E).

fied at two hearings held in front of Judge Henry on March 3 and March 14, 2005.

At the March 3rd hearing, Moberg's attorney told Judge Henry that the problem was that "no blood samples were retained that would permit any subsequent testing by the defendant. [That] is [the] problem with the foundational elements." Judge Henry responded that the issue appeared to be one of law: "[whether] you are requiring more foundation than is necessary". Judge Henry then suggested that the matter could "probably be handled [by] oral argument" rather than an evidentiary hearing—presumably, because the issue appeared to turn on a question of statutory interpretation, rather than on the particular facts of the hospital's blood collection and testing procedures.

A little later, when Judge Henry returned to Moberg's "foundation" objection, she asked the parties if there was anything she needed to consider beyond the parties' written pleadings and their oral argument of the issue. Both the prosecutor and the defense attorney declared that the issue could be decided on that basis. In other words, both parties agreed with Judge Henry that the issue was one of law.

Judge Henry heard additional argument on this matter on March 14th. At that second hearing, Judge Henry asked the defense attorney if Moberg would still object to the admission of the blood test result if the Municipality introduced evidence showing that the hospital's testing procedure was accurate. The defense attorney replied that the accuracy of the test was not the issue. Rather, the crucial issue was that hospital had not held onto the blood. According to the defense attorney, the Department of Public Safety regulation "[requires the tester to] keep a duplicate sample". Because the hospital did not retain the blood, the defense attorney argued, the test result was inadmissible even though the testing may otherwise have been done properly.

Judge Henry ultimately concluded that it did not matter whether subdivision (3) of 13 AAC 63.110 required retention of a blood sample until a defendant either conducts or waives re-testing. Instead, Judge Henry concluded that the requirements of 13 AAC

63.110 apply only to blood testing conducted by the government. The judge held that 13 AAC 63.110 does not govern blood testing conducted by hospitals and clinics for medical purposes.

*(b) The regulation at issue, 13 AAC 63.110, does not govern blood testing conducted by medical care providers for medical purposes*

■ On appeal, Moberg renews his argument that the Alaska Native Medical Center was obliged to adhere to the requirements of 13 AAC 63.110 when sampling and testing Moberg's blood. But Moberg's argument overlooks the introductory clause of this regulation.

The beginning words of 13 AAC 63.110 are: "The following procedures must be followed to collect and retain a blood sample *collected under AS 28.35.033 or 28.35.035*". That is, the regulation itself declares that it applies only to the blood tests authorized by these two statutes.

The first of these statutes, AS 28.35.033, has one subsection that authorizes blood testing. Subsection (e) of this statute declares that an arrested motorist whose breath or blood has been tested by the government has a right to an independent chemical test by "a physician ... or other qualified person of the [motorist's] choosing". Although subsection (e) does not specify that this independent chemical test will be a blood test, very few (if any) private health care providers possess breath testing machines approved for use in the State of Alaska—and thus, of necessity, the independent test authorized by AS 28.35.033(e) will normally be a blood test.

The second of these statutes, AS 28.35.035, authorizes the government to conduct a blood test of an arrested motorist if (1) there is probable cause to believe that the motorist, through an act of intoxicated driving, is responsible for causing the death or serious physical injury of another person, or if (2) the motorist is unconscious or is otherwise incapable of expressing refusal of the breath test normally mandated by AS 28.35.031(a).

Moberg's blood test was not conducted under either of these statutes. His blood

was not tested by the government under the circumstances set forth in AS 28.35.035, nor was his blood test an independent chemical test authorized by AS 28.35.033. Rather, Moberg's blood was tested by the Alaska Native Medical Center for medical purposes. By its terms, 13 AAC 63.110 does not govern such a test.

Moberg argues that, despite the wording of 13 AAC 63.110, the legislature must have intended this regulation to apply whenever the government seeks to introduce the result of a blood test in criminal litigation—regardless of why, or by whom, the testing was done. Moberg points out that most of the provisions of 13 AAC 63.110 are addressed to ensuring the integrity of the blood sample and the accuracy of the testing. He therefore contends that 13 AAC 63.110 was intended to establish the evidentiary foundation for introducing any blood test result.

The first problem with Moberg's argument is that, as we explained above, Moberg never questioned the hospital's compliance with the "quality assurance" provisions of the regulation. Instead, Moberg asserted that the hospital's sole mistake was failing to retain the blood sample long enough for Moberg to have it re-tested when, months later, he was charged with DUI. Thus, the validity and carefulness of the hospital's sampling and testing procedures was never at issue.

And, with respect to the hospital's failure to retain the blood sample long enough for Moberg to have it re-tested after he was charged with DUI, we again note that the district court expressly found that Moberg was aware that he was being investigated for a criminal offense and "that [the alcohol content of his] blood might be used in a criminal prosecution". Thus, Moberg's argument is governed by our decision in *Bradley v. State*, 662 P.2d at 995—our holding that a hospital blood test result is admissible against a defendant, even though the State fails to retain a sample of the blood, because the blood sample was in the possession of an independent entity (*i.e.*, the hospital) and was equally available to both the defendant and the government.

More importantly, though, we have examined the legislative history of AS 28.35.033 and 13 AAC 63.110, and this history fully corroborates Judge Henry's conclusion that 13 AAC 63.110 was not intended to apply to blood tests conducted by hospitals and clinics for medical purposes.

AS 28.35.033 was originally enacted in 1969; it was part of the package of legislation that included Alaska's first "implied consent" law—AS 28.35.031, the statute that places a duty on arrested motorists to take a breath test.[12]

For the most part, the 1969 version of AS 28.35.033 looked much like the current version of the statute. Subsection (a) listed the various presumptions to be drawn from the result of a breath test. Subsection (e) gave motorists the right to seek an independent chemical test from a physician or other qualified person of their choosing. And subsection (d) declared that, "[t]o be considered valid under the provisions of this section[,] the chemical analysis of the person's breath [must] have been performed according to the methods approved by the Department of Health and Welfare."

(The responsibility for formulating testing procedures was originally entrusted to the Department of Health and Welfare. When, two years later, this department was renamed the "Department of Health and Social Services", the wording of subsection (d) was amended to reflect this change.[13] And when, in 1987, the governor issued an executive order transferring this responsibility to the Department of Public Safety, the wording of subsection (d) was again amended to reflect this change.[14])

To resolve the issue presented in Moberg's case—whether the Department's testing procedures apply to blood tests conducted by a hospital for medical purposes—it is important to note that, as enacted in 1969, subsection (d) of the statute declared that the "methods approved by the Department of

---

12.  *See* SLA 1969, ch. 83, § 1.

13.  *See* SLA 1971, ch. 104, § 6.

14.  *See* Executive Order No. 67, §§ 1–2 (1987).

Health and Welfare" applied only to "the chemical analysis of the person's *breath*".

At that time, under Alaska's implied consent law (AS 28.35.031), the police only had the authority to ask a motorist to take a breath test. The police had no authority to test the motorist's blood. At the same time, however, AS 28.35.033(e) gave motorists the right to seek an independent chemical test—and, as explained above, this independent test usually took the form of a blood test.

It is therefore significant that, under subsection (d), the Department's prescribed methods of testing applied only to *breath* tests. This limitation strongly suggests that the legislature did not intend for the Department to establish testing procedures for all chemical tests—in particular, the blood tests that motorists would be obtaining under subsection (e). Rather, the legislature intended the Department's procedures to apply only to the breath tests conducted by the government under the authority of the implied consent law, AS 28.35.031.

This interpretation is corroborated by the fact that when the Department of Health and Welfare (later, the Department of Health and Social Services) promulgated its regulations to carry out the mandate of this statute, those regulations were concerned solely with *breath* testing devices and procedures. *See* former 7 AAC 30.010—080.[15] The Department promulgated no blood testing regulations.

In 1982, the Alaska Legislature enacted AS 28.35.035.[16] This statute, for the first time, authorized the police to take blood samples (as opposed to breath samples) from some motorists—specifically, motorists who were involved in accidents resulting in death or serious physical injury, and motorists who were unconscious or otherwise incapable of manifesting a refusal to take the breath test authorized by AS 28.35.031.

In conjunction with this new statute, the legislature amended the first sentence of AS 28.35.033(d) to include a new reference to blood testing: "To be considered valid under the provisions of this section[,] the chemical analysis of the person's breath *or blood* [must] have been performed according to the methods approved by the Department of Health and Social Services."[17] But, based on the fact that the legislature added this reference to blood testing only when the legislature authorized the police to take blood samples from some motorists, it appears that the legislature was continuing its earlier policy that the Department's testing regulations would apply only to chemical tests conducted by the government—the breath tests conducted under the authority of AS 28.35.031, and the blood tests conducted under the authority of AS 28.35.035.

Again, this interpretation is borne out by the regulations adopted by the Department. After the legislature made these statutory changes in the 1982 legislative session, the Department of Health and Social Services promulgated three new regulations—7 AAC 30.100, 110, and 190—to govern the newly authorized blood tests.[18]

7 AAC 30.100 was the regulation that specified the procedures for collecting and handling blood samples. This regulation later became 13 AAC 63.110, after the authority for prescribing the procedures for chemical testing was transferred to the Department of Public Safety in 1987.[19]

As originally promulgated in 1982, 7 AAC 30.100 began with the words, "The following procedures must be followed to collect and retain blood samples for blood alcohol analy-

---

**15.** 7 AAC 30.010, 020, 030, 040, 050, 060, 070, and 080 were promulgated by the Department in Alaska Administrate Code Register 32, effective February 20, 1970. 7 AAC 30.035, 045, and 055 were promulgated by the Department in Register 85, effective February 2, 1983. The last additions to this series of regulations, 7 AAC 30.005, 047, and 049, were promulgated in Register 93, effective December 19, 1984.

**16.** *See* SLA 1982, ch. 117, § 21.

**17.** *See* SLA 1982, ch. 117, § 20 (emphasis added).

**18.** These regulations were promulgated by the Department in AAC Register 84 (January 1983), effective September 22, 1982. (For reasons that are not explained, these regulations were first published in AAC Register 85 (April 1983).)

**19.** *See* AAC Register 112, Part 2, (January 1990).

sis".[20] To the extent that this wording might be interpreted to cover *all* blood testing, it potentially supports Moberg's position that the Department's regulation was intended to govern not only blood testing conducted by the police but also blood testing conducted by hospitals and clinics for medical purposes.

But the Department apparently realized that this wording was misleadingly broad—because two and a half years later, in May 1985, the Department amended the opening language of 7 AAC 30.100 to read: "The following procedures must be followed to collect and retain blood samples *collected under AS 28.35.035* ".[21] This amended wording clarified the regulation's intent: it did not apply to the independent blood tests obtained by defendants under AS 28.35.033(e), nor did it apply to blood tests conducted by hospitals and clinics for medical purposes. Rather, the regulation's scope was clearly confined to the blood samples collected by the police under the authority of AS 28.35.035.

In 1987, the governor transferred the responsibility for these matters from the Department of Health and Social Services to the Department of Public Safety. As a result, the Department of Public Safety took the Department of Health and Social Services' regulations (7 AAC 30.005 *et seq.*) and repromulgated these regulations as 13 AAC 63.010 *et seq.*[22]

When the Department of Public Safety repromulgated 7 AAC 30.100 as the new 13 AAC 63.110, the Department changed the introductory language once more. The regulation now reads: "The following procedures must be followed to collect and retain a blood sample collected under *AS 28.35.033 or* 28.35.035".[23] As explained above, this language ostensibly means that the regulation now covers (1) blood tests conducted by the police under the authority of AS 28.35.035 and (2) independent blood tests obtained by defendants under the authority of AS 28.35.033.

One might debate whether this change of wording (*i.e.*, the Department's decision to include the independent blood tests authorized by AS 28.35.033(e)) is consistent with the legislative intent underlying the authorizing statute, AS 28.35.033(d). But that issue is irrelevant to the decision of Moberg's appeal. Moberg's case involves neither a government blood test conducted under AS 28.35.035 nor an independent blood test authorized by AS 28.35.033(e). Rather, Moberg's case involves a blood test conducted by a hospital for medical purposes. Thus, 13 AAC 63.110 does not apply.

For these reasons, we agree with the district court that the result of the blood test conducted by the Alaska Native Medical Center was admissible against Moberg, even assuming (for purposes of argument) that the hospital did not comply with all of the provisions of 13 AAC 63.110.

We disavow any suggestion to the contrary in *Macauly v. State*, 734 P.2d 1020, 1025–26 (Alaska App.1987).

This is not to say that, at trial, Moberg was barred from attacking the accuracy or trustworthiness of the hospital's blood test result by showing that the hospital's procedures for collecting and ensuring the integrity of the blood sample failed to comply with the practices codified in 13 AAC 63.110.

To the extent that the requirements of this regulation overlap with, or are pertinent to, the foundational requirements specified in Alaska Evidence Rule 901, a defendant could argue that a hospital's failure to comply with these procedures renders the evidence of a blood test result inadmissible under Evidence Rule 901 or Evidence Rule 403. Moreover, even when a blood test result is admissible under Rule 901 and Rule 403, the defendant is still free to argue to the jury that a hospital's failure to comply with the procedures listed in 13 AAC 63.110 might constitute a reason for doubting the trustworthiness of the blood test result. That is, the defendant could urge the jury to give

---

**20.** *See* AAC Register 84 (January 1983), first published in AAC Register 85 (April 1983).

**21.** *See* AAC Register 94 (July 1985), effective May 16, 1985 (emphasis added).

**22.** *See* AAC Register 112, Part 2 (January 1990).

**23.** *See* AAC Register 110 (January 1990), effective April 29, 1989 (emphasis added).

little weight to the blood test result, even though the result is admissible.

But, as we explained above, when Moberg litigated this issue in the district court, he never claimed that the hospital's blood collection and testing procedures cast any doubt on the accuracy of his test result. Moberg's sole claim was that 13 AAC 63.110 obliged the hospital to retain a sample of his blood until after he was charged—and that, because the hospital failed to comply with this purported duty, the blood test result was inadmissible. This was not a valid objection to the admission of the blood test result.

*Moberg's attacks on the search warrant authorizing the police to seize the hospital records containing evidence of Moberg's blood alcohol level*

As we explained earlier in this opinion, the Municipality obtained its evidence of Moberg's blood alcohol level when the district court issued a search warrant for Moberg's medical records at the Alaska Native Medical Center. Moberg contends that this search warrant should not have been issued; he argues that the affidavit in support of the search warrant application fails to establish probable cause to believe that he had committed the crime of driving under the influence.

The search warrant affidavit reads as follows:

> On 8-6-03 at about 19[:]39 Lawrence Moberg was involved in a motor vehicle collision at Tudor and Checkmate. Moberg was on a motorcycle and ran into the back of a vehicle backed up in traffic. Moberg sustained a head injury and a broken left leg and was transported to ANMC by medics. On contact at ANMC he smelled strongly of alcohol, had blood shot watery eyes, and admitted to consuming alcohol, although he would not tell me how much he had to drink, or where he had been drinking. Hospital staff advised that Moberg's blood had been drawn, and they would be testing it for the presence of

alcohol. Moberg has three prior convictions for DUI[:] 1–94[,] 5–93[, and] 4–93.

■ Moberg first argues that the search warrant affidavit could not properly include the information that the hospital had drawn a sample of Moberg's blood for testing. Moberg contends that this information—*i.e.,* the fact that a sample of Moberg's blood had been drawn, and the fact that the hospital planned to test this blood sample for alcohol content—was a part of his private medical records, a component of his medical treatment, and thus the hospital staff had no right to disclose this information to the police.

When Moberg raised this medical privacy argument in the district court, Judge Henry concluded that Moberg's right of medical privacy did not include the mere fact that his blood had been drawn, or that the hospital planned to test the blood sample in the future.

In Moberg's brief to this Court, he asserts that Judge Henry was wrong about this, but Moberg fails to provide any authority on this point, with the exception of *Whalen v. Roe*,[24] a case dealing with the constitutionality of a statute that required health care providers to reveal the identities of people who were given prescriptions for certain types of controlled substances.

In the absence of meaningful briefing on this point, we confine ourselves to noting two things. First, under Alaska law, the physician-patient privilege does not apply to criminal proceedings. *See* Alaska Evidence Rule 504(d)(7). Second, as this Court noted in *Moudy v. Superior Court,* 964 P.2d 469 (Alaska App.1998), even the broader attorney-client privilege normally does not protect the "incidents of representation"—a class of information that includes the client's name, the amount and payment of a fee, and the fact that an attorney-client consultation occurred.[25]

Whatever might be said in favor of Moberg's position (*i.e.,* the argument that the hospital staff were forbidden from even re-

---

**24.** 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

**25.** *Moudy,* 964 P.2d at 471, citing Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (7th ed.1998), Vol. 2, pp. 711–12.

vealing that they planned to test Moberg's blood), Moberg has failed to adequately brief this point. The argument is therefore waived.[26]

■ Moberg next argues that, even taking the search warrant affidavit as a whole (that is, with the inclusion of the information that the hospital planned to test Moberg's blood), the affidavit still fails to establish probable cause to believe that Moberg had committed the crime of driving under the influence.

There is no merit to this argument. The affidavit asserts that "Moberg was on a motorcycle and ran into the back of a vehicle backed up in traffic"; that Moberg sustained injuries and was transported to the hospital; and that "[o]n contact at [the hospital], he smelled strongly of alcohol, had blood shot watery eyes, and admitted to consuming alcohol".

Moberg argues that the affidavit does not expressly assert that Moberg was driving the motorcycle (as opposed to riding as a passenger). But we are to interpret search warrant affidavits "in a commonsense and realistic fashion".[27] Here, the affidavit asserts that "Moberg ... ran into the back of [another] vehicle". The clear inference is that Moberg was directing the motion of the motorcycle.

Moberg also faults the affidavit for failing to explicitly identify the amount of time between the motor vehicle accident and the hospital's act of drawing Moberg's blood for testing, or the officer's later interview with Moberg at the hospital. But "[a] magistrate and [a] reviewing court can draw reasonable inferences about the recency of the alleged crime from the evidence supporting the warrant request".[28]

Moreover, if we draw the common-sense inference that Moberg consumed no further alcoholic beverages after he was transported to the hospital, it does not matter (for the limited purpose of assessing probable cause) how much time elapsed between the accident and the blood sampling or the officer's later interview with Moberg at the hospital. In fact, one might argue that the longer the interval, the more incriminating the information that Moberg still smelled strongly of alcoholic beverages and had bloodshot, watery eyes.

Moberg's final argument is that the search warrant affidavit fails to explain how the officer obtained the information that Moberg had been riding a motorcycle and that Moberg had driven into the rear of another vehicle that had slowed or stopped for backed-up traffic.

Judge Henry concluded that it was obvious, from the affidavit, that the officer must have obtained his information either from witnesses on the scene or from another police officer who had interviewed witnesses on the scene. We agree.

The Alaska Supreme Court addressed a similar challenge to a search warrant in *State v. Davenport*, 510 P.2d 78 (Alaska 1973). The defendant in *Davenport* was charged with receiving and concealing stolen property after the police obtained a warrant to search his residence, based on the prior discovery (inside the residence) of a handgun that had been stolen during a burglary of Howard's Gun Shop in Anchorage.[29] Davenport contended that the affidavit in support of the search warrant was insufficient because (1) the officer who applied for the warrant had relied on hearsay when he asserted that Howard's Gun Shop had been burglarized, and that the stolen handgun had been found inside Davenport's residence, and because (2) the officer's affidavit did not specify the sources of this hearsay, nor attempt to establish the trustworthiness of these sources.[30]

**26.** See *Katmailand, Inc. v. Lake and Peninsula Borough*, 904 P.2d 397, 402 n. 7 (Alaska 1995); *Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 410 (Alaska 1990); *Wren v. State*, 577 P.2d 235, 237 n. 2 (Alaska 1978); *Kristich v. State*, 550 P.2d 796, 804 (Alaska 1976).

**27.** *State v. Davenport*, 510 P.2d 78, 82 n. 8 (Alaska 1973), quoting *United States v. Ventresca*, 380

U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

**28.** *Williams v. State*, 737 P.2d 360, 362 (Alaska App.1987).

**29.** *Davenport*, 510 P.2d at 80.

**30.** *Id.* at 82 & n. 8.

In footnote 8 of its opinion, the supreme court summarily rejected this attack on the search warrant affidavit:

We simply note Davenport's argument that [the officer's] failure to name the source of his information a) that Howard's Gun Shop had been burglarized, and b) that a gun had been discovered at Davenport's residence following his arrest invalidates the warrant. We do not agree. It is not necessary that every assertion of fact [in a search warrant affidavit] be traced to its ultimate source. The Fourth Amendment's requirements are practical and not abstract, and affidavits "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion.... Technical requirements of elaborate specificity ... have no proper place in this area." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

*Davenport,* 510 P.2d at 82 n. 8.

As was true in *Davenport,* a common-sense reading of the affidavit in Moberg's case leads to the conclusion that the officer's information about the occurrence of the accident (his assertions that Moberg had been riding a motorcycle, and that Moberg had driven into the rear of another vehicle that had slowed or stopped for backed-up traffic) must have come from sources whose trustworthiness is presumed: on-the-scene witnesses, and/or other police officers.[31]

Because the officer's affidavit, interpreted in a realistic and common-sense fashion, shows that the challenged information was obtained in a way that satisfies the *Aguilar–Spinelli* test,[32] we uphold Judge Henry's denial of Moberg's suppression motion.

### Conclusion

The judgement of the district court is AFFIRMED.

**31.** *See Landon v. State,* 941 P.2d 186, 190 (Alaska App.1997); *Stam v. State,* 925 P.2d 668, 670 (Alaska App.1996) (when assessing the trustworthiness of hearsay information contained in a search warrant application, courts presume that police officers and citizen informants are credible sources of information).

**32.** *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *See State v. Jones,* 706 P.2d 317, 322–25 (Alaska 1985) (holding that, as a matter of state law, the *Aguilar–Spinelli* test continues to govern the evaluation of hearsay information offered to support a search or seizure).